**IN RE PRUDENTIAL SECURITIES IN-
CORPORATED LIMITED PART-
NERSHIPS LITIGATION.**

MDL Dkt No. 1005.
No. M–21–67 (MP).

United States District Court,
S.D. New York.

June 10, 1996.

Goodkind Labaton Rudoff & Sucharow L.L.P. by Joel H. Bernstein, Lawrence A. Sucharow, New York City, Finkelstein, Thompson & Loughran by William P. Butterfield, Washington, D.C., Milberg, Weiss, Bershad, Hynes & Lerach by Melvyn I. Weiss, Kevin P. Roddy, New York City, Krislov & Associates, Ltd. by Clint Krislov, Chicago, Illinois, for Plaintiffs.

Weil, Gotshal & Manges L.L.P. by Dennis J. Block, Joseph Allerhand, New York City, for Defendants, Polaris Holding Company, Polaris Aircraft Leasing Corp., Polaris Investment Management Corp. and Polaris Securities Corp., Peter G. Pfendler.

MILTON POLLACK, Senior Judge.

The "Polaris defendants" moved pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the claims asserted against Polaris in the plaintiffs' Consolidated Complaint. The Court has converted this motion into a motion for summary judgment on behalf of the moving parties pursuant to Fed.R.Civ.P. 56. The motion rests on two primary grounds: (1) the alleged disclosure in the Polaris prospectuses of the very risks which plaintiffs claim were omitted or misrepresented; and (2) the statute of limitations.

## I. Background

This class suit is set in the context of an alleged scheme during the 1990's undertaken by Prudential Securities International ("PSI") and its affiliates to mislead a multitude of investors, by alleged fraud, into purchasing units of interest in limited partnerships sold through PSI's Direct Investment Group ("DIG"). Plaintiffs filed a Consolidated Complaint on June 8, 1994, listing 37 named representative plaintiffs as members of a putative class action. The intended class consists of "[a]ll persons or entities, acting in their own capacity or in a representative capacity, who purchased Units in any of the Partnerships between January 1, 1980 and December 31, 1991, inclusive ... and were damaged thereby." (Consolidated Complaint at ¶ 22.) Excluded from the class are, *inter alia*, persons who have availed themselves of the fund created by Prudential's October 21, 1993 settlement with the Securities Exchange Commission.

Polaris was one of the sponsoring organizations that sold units in limited partnerships through PSI. The Consolidated Complaint implicates eleven partnerships for which Polaris was the sponsoring organization. These include Polaris Aircraft Investors I and II(a–d) ("PAI"), sold from 1982 until 1984, and Polaris Aircraft Investment Funds I–VI ("PAIF"), sold from 1985 until 1991.[1] The business plan for these partnerships was to purchase used commercial jet aircraft, lease the aircraft to third parties under short-term operating leases and sell the aircraft after several years. The stated investment objectives were to generate substantial cash from leasing operations to distribute the income thereof to investors quarterly; provide cash distributions to investors upon specific sales of aircraft; and preserve investors' capital.

Plaintiffs charge Polaris with violating 18 U.S.C. § 1962(a), (c), and (d) in connection with PAIFs I–VI. As predicate acts for these RICO violations, the plaintiffs allege three types of securities fraud: § 10(b) and Rule 10b–5 of the 1934 Securities and Ex-

---

**1.** However, plaintiffs make no allegations about misrepresentations in connection with the five offerings comprising PAIF I and II(a–d), and no named plaintiff purchased units in any of these earlier offerings.

change Act and § 11 and 12(2) of the 1933 Securities Act, as amended. They also allege mail fraud and wire fraud. The mail fraud allegedly consists of both the mailing of sales materials with misleading information or fraudulent omissions, and the mailing of false and misleading account statements. The wire fraud includes transmissions on PSI's nationwide computer system of false or misleading data to be used in the monthly account statements.

## II. Summary Judgment Standard

■ Under Fed.R.Civ.P. 12(b), if "matters outside the pleading are presented to, and not excluded by the Court," the Court must convert defendants' 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988); *Ellis v. The Civil Service Employees Assoc., Inc.,* 913 F.Supp. 684, 688–689 (N.D.N.Y.1996). Rule 12(b) instructs that prior to such conversion, courts should give parties "reasonable opportunity to present all material made pertinent" to a summary judgment motion by Rule 56. However, the Court need not provide formal notice of conversion to the parties where, as here, it has already accepted from both sides, materials other than pleadings. *In re G. & A. Books, Inc.,* 770 F.2d 288, 295 (2d Cir. 1985), *cert. denied,* 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Goyette v. DCA Advertising Inc.,* 830 F.Supp. 737, 741 (S.D.N.Y.1993).

A motion for summary judgment may not be granted unless the Court determines that there is no genuine issue of material fact to be tried. *See* Fed.R.Civ.P. 56; *Donahue v. Windsor Locks Bd. of Fire Commissioners,* 834 F.2d 54, 57 (2d Cir.1987). The burden of showing that no genuine factual disputes exist is on the parties seeking summary judgment, and "the court is not required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." *Cronin v. Aetna Life Ins. Co.,* 46 F.3d 196, 202 (2d Cir.1995). If no reasonable trier of fact could find for the non-moving party, the court may grant relief on a motion for summary judgment. *Taggart v. Time, Inc.,* 924 F.2d 43, 46 (2d Cir.1991).

## III. Bespeaks Caution

The Consolidated Complaint alleges RICO claims which rely on a scheme to sell investments in 6 limited partnerships from 1985–1991 through the selective use of both misrepresentations in sales materials and prospectuses and knowingly fraudulent material omissions, particularly with respect to the residual value of aircraft purchased by Polaris. The moving defendants contend that prospectuses "bespoke caution" by disclosing all of the relevant risks; that the prospectuses addressed market demand for and residual values of the partnerships' aircraft. In response to the charge in the complaint that defendants knew but did not disclose that resale values of aircraft were forecast to decline and to be practically nonexistent in the future, the defendants argue that plaintiffs seek unjustifiably to impose a duty of clairvoyance on defendants. Defendants contend that they did not have a duty to speculate in the prospectuses as to the future market conditions, e.g., "fraud by hindsight," because the decline in residual values only became apparent, they say, "years after" the partnerships were sold.

The plaintiffs responded initially that the issues could not properly be determined on the pending motion; that even their limited discovery heretofore, which was suspended initially but then was recently resumed, evidenced material issues of triable facts. Plaintiffs assert that the alleged risk disclosures made by the defendants were generalized, deliberately uninformative and falsified, incomplete, and were wholly inadequate to apprise investors of the actual risks they faced. Plaintiffs argue that defendants fraudulently concealed and intentionally and knowingly suppressed these risks, so that no reasonable inquiry would have revealed the true facts on any obligatory inquiry.

■ The bespeaks caution doctrine allows courts to rule that a defendant's forward-looking representations contain enough cautionary language or risk disclosures to protect against claims of securities fraud. It has been applied at the pleading stage to dismiss

securities fraud claims when prospectuses have contained extensive and specific warnings about the riskiness of investments. *See In re Donald J. Trump Casino Securities Litigation,* 7 F.3d 357 (3d Cir.1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). However, some courts have refused to apply the doctrine at the pleading stage where defendants are alleged to have information that makes even the asserted cautionary statements fraudulent. *See In re Marion Merrell Dow Inc. Securities Litigation,* 1993 WL 393810, *8 (W.D.Mo.); *Rubinstein v. Collins,* 20 F.3d 160 (5th Cir.1994).

Those cases have held that while cautionary language is relevant in assessing the materiality of predictive statements, it is not dispositive. *Rubinstein,* 20 F.3d at 167–168. The bespeaks caution doctrine involves an examination of statements in the context in which they were made. It is thus not a *per se* bar to recovery in all cases where, as here, disclosure is accompanied by some cautionary language.

 Several significant limitations on the bespeaks caution doctrine appear relevant. Cautionary language cited to justify application of the doctrine must precisely address the substance of the specific statement or omission that is challenged. *Trump,* 7 F.3d at 371–372. In addition, cautionary language does not protect material misrepresentations or omissions when defendants knew they were false when made. *Huddleston v. Herman & MacLean,* 640 F.2d 534 (5th Cir.1981), *rev'd in part on other grounds,* 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Rubinstein,* 20 F.3d at 171.

 Plaintiffs' allegations and discovery data obtained to date have raised issues of material fact with respect to these limitations on the bespeaks caution doctrine. The Consolidated Complaint alleges that Polaris knew, but did not disclose, at the time the prospectus and sales pitches were designed, that it had purchased aircraft with evanescent residual values that would decline dramatically to the point of virtual non-existence

as a practical matter.[2] Plaintiffs cite evidence gleaned during the limited discovery to date that experts retained by Polaris predicted and warned the marketeers of the limited partnerships that residual values of its aircraft *would* decline radically. This information contradicted both the residual value information provided in sales materials and the inadequate warnings in prospectuses that residual value *could* decline. General risk disclosures in the face of specific known risks which border on certainties do not bespeak caution:

> To warn that the untoward may occur when the event is contingent is prudent; to caution that it is only possible for the unfavorable events to happen when they have already occurred is deceit.

*Huddleston,* 640 F.2d at 544. The doctrine of bespeaks caution provides no protection to someone who warns his hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away. The bespeaks caution doctrine requires a contextual analysis and, in context, even apparently specific risk disclosures like those in Polaris' prospectus are misleading if the risks are professionally stamped in internal undisclosed analyses (as they were here) as significantly greater or more certain than those portrayed in the prospectus. *See In re Apple Computer Securities Litigation,* 886 F.2d 1109, 1115 (9th Cir.1989), *cert. denied,* 496 U.S. 943, 110 S.Ct. 3229, 110 L.Ed.2d 676 (1990) ("There is a difference between knowing that any product in development may run into a few snags and knowing that a particular product has already developed problems . . . .").

In *Marion Merrell,* 1993 WL 393810 (W.D.Mo.), the Western District of Missouri found that asserted cautionary language, although it specifically addressed the risk that a company would not receive FDA approval of selling a prescription drug over the counter, did not go far enough given the magnitude of the risk of FDA disapproval:

> The 1991 Annual Report stated twice that "there can be no assurance . . . that ap-

---

**2.** Consolidated Complaint App. F–7 at Paras. 26– 27, 41, 43, 54–60, 62–63, 65–66.

proval will be received from the FDA ...'' The Prospectus contains the same language. The statement is a generic warning that [defendant] would provide for any drug for which it would seek OTC status. It is not enough that the plaintiffs recognized a risk; rather, given the plaintiffs' allegation, the statements did not sufficiently caution the plaintiffs of the magnitude of the risk ...

*Marion Merrell*, at *8. The court continued, citing *Huddleston* for the proposition that even qualified statements may not be sufficiently cautionary to warrant dismissing cases on motions addressed to the pleadings when defendants are alleged to have information which makes those statements fraudulent:

> At this stage in litigation it cannot be judicially assumed the much vaunted OTC application was pursued with reasonable prospects of success. Thus it cannot be assumed that cautionary language that may be sufficient ninety-nine times out of a hundred was sufficient in this case.

*Merrell*, at *9.

Like other Limited Partnerships sold by Prudential during the 1980's, the Polaris Partnerships were structured as direct investments. The limited discovery to date has revealed that Polaris was directly involved in marketing its limited partnerships. Polaris authored most of the sales material given to brokers and investors[3]. Polaris told brokers and investors that its investment strategy would work as follows[4]:

> · In approximately 8–12 years, the partnerships' aircraft would be sold at prices equal to, or above, their original cost to the partnerships. The limited partners' original capital would then be returned. The limited partners would also receive the benefit of any appreciation of their capital if the planes sold for more than their original purchase price.

Hence, Polaris said that its investment strategy offered "[r]egular, high-yielding income, and opportunity for substantial overall returns, and, of course, capital preservation"[5] and its return through the proclaimed residual values on sales.

The critical component of Polaris' investment strategy was the value of the aircraft at the end of the Partnerships' lives (i.e. the "residual values"). The only way that this strategy could make any economic sense to a potential investor and that the investment strategy of capital preservation could be met was if the partnership aircraft were expected to be worth at the end of the partnerships' lives at least as much as they were at the beginning.[6] If, on the other hand, the value of the aircraft was professionally believed to diminish during the period of partnership operations in perceptible segments, it would be impossible for the partnerships to preserve capital, investors' distributions would constitute a return of capital and investors would suffer capital losses (all as happened here). In sum, there would be no "high-yielding income," "substantial overall returns" or "capital preservation."

Polaris commissioned BK Associates ("BK"), a well-respected aircraft appraiser, to furnish it with residual values of the aircraft purchased. These appraisers reported an expectable, vanishing value for the residuals. The auditors of the company required those appraisals of current fair market value for their financial reports because a portion of the expected resale value, was booked as income to Polaris in each year's income reports. Throughout the offering period of the Income Funds, BK's reports to Polaris continued to conclude that the residual value of Partnership Aircraft would fall significantly, but these consequences were never revealed to purchasers and no amount of suspicion or inquiry by diligent purchasers, could have elicited these facts so material to the value of the investments. Another appraisal organization utilized by the defendants reached similar adverse conclusions in 1988 on residual values. *See Avitas Report.*

3. Tab A, Linnan Deposition Transcript at 76, 85.

4. Tab G at SM005904.

5. Tab G at SM005901.

6. Indeed, plaintiffs have alleged that to offset fees and commissions charged by brokers and Polaris, residual values actually had to increase by 35% during the partnerships' lives.

The risk disclosures to which Polaris points in rebuttal were simply carefully masked general warnings that residual values of its aircraft could decline. This is a far cry from disclosure of what Polaris had in its possession when these assertions were made—that residual value appraisals and studies existed to their knowledge that contained the true residual value information not used in its sales materials and, in turn, not conveyed to brokers and investors. None of the sales material disclosed the BK appraisals of residual value, the conclusions of the *Avitas Report,* or the concerns expressed in the aircraft industry, that the narrow-bodied aircraft utilized by defendants would not hold their value over more than a few years. Unrealistic and knowingly false projections of high residual values, with no basis except for out-dated government reports were issued publicly, while at the same time the internal expert studies which projected material vanishing residual values were concealed.

The allegations made by plaintiffs parallel those of several other Southern District cases in which defendants knew that projected profits could never be realized. In *Matignon Finance, Inc. v. Ameritel Communications Corporation,* 1989 WL 153282, *5 (S.D.N.Y.), the court rejected a motion to dismiss claims that a defendant issued a private placement memorandum ("PPM") stating that its product was experiencing a "successful reception" and investors could expect to receive cash distributions of profits when it knew that its product was not functioning properly and was losing money. Although the defendant's PPM stated that the investment was "high risk" and that "some assumptions inevitably will not materialize and unanticipated events and circumstances may occur," the court concluded that these warnings were not enough:

> The Court does not find ... however, that the cautionary language resolves the issue of fraud. Plaintiffs do not allege merely

that the projected profits were not realized by Tel–Com, but that the projected profits were never intended to be realized and that defendants are responsible for contriving the failed venture.

Similarly, in *Kane v. Wichita Oil Income Fund,* 1991 WL 233266, *2 (S.D.N.Y.), the court rejected a motion to dismiss securities fraud claims using similar logic:

> [a]s alleged in the complaint, there are many examples of information, both included in and omitted from the offering memorandum, that created the impression that Wichita Oil would yield a profit, where no profit was actually possible ... from their longstanding experience in the oil industry, defendants knew, but failed to disclose, that the amount of money needed to bring the wells up to full production was out of proportion to the income expected to be generated at full production levels, dooming Wichita Oil to economic failure.

The court concluded that while defendants might ultimately succeed at trial on a bespeaks caution defense, the plaintiffs' allegations were sufficient to survive a motion to dismiss.

The logic behind these decisions is clear. Warnings of possible detriment are insufficient if they are simply a smoke screen to cover a company's internal reasonably informed certainty of detriment. Plaintiffs allege that the projections in the offering materials as to return of investors' capital through residual value of the acquired aircraft by Polaris were not honestly-held beliefs at the time they were made.[7] To award summary judgment on the basis of warnings which followed these misstatements would undermine the legitimacy of the bespeaks caution doctrine:

> [u]nder defendants' apparent interpretation of the "bespeaks caution" approach, one could construct a completely inaccu-

---

7. *See, e.g. PAIF I Marketing Guide* ("The price of new aircraft continues to rise ... We believe this trend will continue"); *PAIF III Slide Presentation Script* ("as again we look at these factors, including the cost of new technology and the demand for this particular type of asset, we anticipate that the aircraft acquired in this partnership will continue to hold or increase in value over time");

*1988 Aircraft Income Fund Broker/Dealer Marketing Guide* ("As a result of these trends, we expect the residual values of the aircraft purchased by Polaris Income Fund offerings to remain at attractive levels"). Plaintiffs allege that at the time defendants offered these statements, their own internally-commissioned analyses were predicting sharp decreases in residual values.

rate and fraudulent offering memorandum, yet be shielded from a fraud claim as long as there was language in the document cautioning investors of the specific risks. To the extent that such a rule would allow, if not encourage, fraud and non-disclosure on the part of corporate actors, it clearly is not a viable application of the "bespeaks caution" doctrine.

*Gurfein v. Sovereign Group*, 826 F.Supp. 890, 908 (E.D.Pa.1993).

While on its face, the language of Polaris' prospectuses might be sufficient ninety-nine times out of hundred, *see, e.g., Merrell, supra*, several of plaintiffs' allegations at least raise an issue of fact as to whether this case is the exception. Plaintiffs allege that Polaris knew (i) residual values of aircraft would decline dramatically; (ii) that it would not diversify its lessees and would instead target weak or middle-tier airlines for lease transactions rather than creditworthy, major airlines; (iii) that the rates of return projected in its sales material were "virtually unachievable"; and (iv) that the decision to omit this information was intentional.[8] Some of these allegations concern the material omission of "hard" facts, and do not involve "soft" information such as forecasts or opinions for which the bespeaks caution doctrine does provide a defense. *See Harden v. Raffensperger, Hughes & Co., Inc.*, 65 F.3d 1392 (7th Cir.1995) (caution that "there is no assurance" that a event would occur is insufficient where defendant's "hard information"

when statement was made indicated that event would not occur).

## IV. Inquiry Notice/Statute of Limitations

The Polaris defendants contend that plaintiffs were placed on inquiry notice of their alleged RICO injuries when they received their prospectuses for the various Polaris offerings. They argue that the RICO statute of limitations began to run from the moment plaintiffs received prospectuses because of the many "storm warnings" present in those documents which should have alerted plaintiffs to potential fraud. Plaintiffs respond that they were not placed on inquiry notice until 1992, when PSI changed its monthly account statements to reflect the true value of the partnerships. Plaintiffs allege that there were no contradictions between the prospectuses and the sales materials which would have alerted them to the possibility of fraud. For the reasons stated below, the present record does not entitle defendants to summary judgment on the issue on the statute of limitations.

 The statute of limitations for claims under RICO is four years. *Agency Holding Corp. v. Malley–Duff & Assoc., Inc.*, 483 U.S. 143, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). This period of limitations begins to run "when plaintiff discovers or should have discovered an injury." *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir.1988), *cert. denied*, 490 U.S. 1007, 109 S.Ct. 1642, 1643, 104 L.Ed.2d 158 (1989). The Second

---

8. These allegations are supported by evidence produced in depositions of key Polaris personnel as well as in two significant documents which have surfaced in discovery. These documents indicate that even Polaris' parent company, General Electric, may have been aware of Polaris' alleged deception of investors about residual values. The first document is a 1986 due diligence report which stated that residuals on Polaris books "appear to be overstated" by a multiple of approximately 6. The second document is a 1989 General Electric memorandum about Polaris' request for approval to purchase certain airplanes. In making this request, Polaris apparently indicated to General Electric that it was forecasting 25% residual values for some planes, even as Polaris told investors that it expected residual values to remain strong or intact. General Electric doubted even the predictions of 25% residual values, however. The company's chair-

man, Jack Welch, wrote on the memorandum the devastating comment that: "This is a disaster building ... They can't assume these residuals. Let's look at this deal at "0" and what does it look like?"

This evidence was not available to those courts in the two earlier decisions relied on by Polaris that held that the Polaris prospectuses bespoke sufficient caution. *See Harner v. Prudential Sec., Inc.*, 785 F.Supp. 626 (E.D.Mich.1992), *aff'd*, 35 F.3d 565 (6th Cir.1994), and *Weisl v. Polaris Holding Co.*, No. 29239/92 (Sup.Ct.N.Y.Co. April 19, 1994), *aff'd* —— A.D.2d ——, 641 N.Y.S.2d 288 (1996). These decisions thus unintentionally overlooked the context in which Polaris' seemingly comprehensive risk disclosures were made. It is this context, rather than the plain language of the prospectuses, which is relevant to the bespeaks caution doctrine.

Circuit has held that the test of inquiry notice is objective:

> The means of knowledge are the same thing in effect as knowledge itself. Where the circumstances are such as to suggest to a person of ordinary intelligence the probability that he has been defrauded, a duty of inquiry arises, and if he omits that inquiry when it would have developed the truth, and shuts his eyes to the facts which call for investigation, knowledge of that fraud will be imputed to him. This rule is fully applicable in cases ... which involve claims of securities fraud.

*Armstrong v. McAlpin,* 699 F.2d 79, 88 (2d Cir.1983) (citations omitted). Since issues of constructive knowledge depend on inferences drawn from the facts of each particular case, summary judgment is often inappropriate on issues on inquiry notice. In fact, Southern District courts have variously described defendants' burden in this regard as "extraordinary" and appropriate only in "extreme circumstances." *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620, 638 (S.D.N.Y.1993); *Freschi v. Grand Coal Venture,* 583 F.Supp. 780, 785 (S.D.N.Y.1984). Although other courts have determined that some of the prospectuses at issue here triggered an inquiry notice, this Court, in view of the record developed thus far by plaintiffs detailing the extent of the alleged scheme and the difficulty in uncovering many of its details, some of which surfaced only in the weeks prior to oral argument on this motion, finds that defendants have not satisfied the test for summary judgment on the issue of statutes of limitations. *See Demski v. Prudential Securities, Inc.,* No. 252027, Slip Op. (Ca.Super.Ct. Oct. 14, 1994) ("it cannot be determined as a matter of law that a reasonable investor, believing that a company with the resources and financial acumen of Prudential was putting its own money into these investments, would not have regarded the apparent discrepancy between the oral representations and the written material as negligible").

■ Prior decisions on this issue have stressed the courts' beliefs that there are contradictions between the prospectus and the other offering materials. This conclusion conflicts with the testimony of several Polaris employees and with a statement on the face of the prospectus. Even if contradictions do exist, they are insufficient to suggest the *probability* that fraud has occurred. As commentators have observed, there are many factors which figure into an investor's reading of a prospectus:

> Although numbers about an unfamiliar venture generated by total strangers may not be credible to any but the most gullible, when the venture is being underwritten or promoted by a well-known brokerage firm, represented by reputable counsel, or when some form of vouching occurs, the projections are read in the aura of a halo ... insofar as plaintiffs' plausibly complain that they were led to believe the optimism was at least genuine, based on the insiders' superior access to information and the plaintiffs' independent assessments of credibility, the standard disclaimers are meaningless ...
> In fact, in terms of persuasion theory, the presence of cautionary language actually may make the projections more influential.

Donald Langevoort, *Disclosures that "Bespeak Caution,"* 49 Bus.Law. 481, 497 (1994). Given the context of the massive effort to sell partnerships on the part of Polaris and Prudential, this Court cannot rule as a matter of law that a multitude of investors acted unreasonably in failing to inquire after reading a prospectus which may have had some differences with sales materials, but which confirmed in investors' minds what plaintiffs now allege was actually false: that defendants had formed the partnerships with "a view toward ... maximizing the residual values of Aircraft upon sale ... providing significant cash distributions ... and providing preservation of capital through ... diversification." *See* PAIF I Prospectus.

The statute of limitations did not begin to run on the date that investors received prospectuses in the limited partnerships, but at the date investors were in possession of sufficient information to suggest the probability of fraud. This did not occur until, at earliest, October, 1990, when capital losses were first suffered as a result of the sale of Polaris

aircraft. Indeed, the record currently before the Court contains no indication that investors even learned of these capital losses until January of 1992, when the format of Prudential's monthly statements was altered so that the value of investments was no longer recorded at par. Thus, it cannot be determined at this stage of the case as a matter of law that investors in any of the Polaris limited partnerships were on notice of their injuries at a point four years prior to the filing of this suit on June 8, 1994.

## V. Other RICO Issues

### A. The Private Securities Litigation Reform Act of 1995

Defendants have raised a further argument in their Second Supplemental Memorandum—that the Private Securities Litigation Reform Act of 1995 ("the Act") has withdrawn this Court's jurisdiction over plaintiffs' RICO claims since those claims rest on the Securities Acts. For the reasons stated below, the Court finds that the provisions of the Act which would affect this case do not apply retroactively.

The new law is designed to protect corporations against the filing of frivolous securities actions. It limits the control of attorneys over securities class actions and provides broader protection for corporate forward-looking statements. It also amends the civil RICO statute to eliminate RICO liability for most securities fraud claims, except for those premised on securities violations where criminal convictions have been entered.

Before the Act was passed, the civil RICO provision read as follows:

Any person injured in his business or property by reason of a violation of Section 1962 of this Chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c).

In response to Congressional concerns that civil RICO served as a loophole for attorneys to bring stale securities actions, the Act offered the following change:

Section 1964(c) of title 18, United States Code, is amended by inserting before the period," except that no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962. The exception contained in the preceding sentence does not apply to an action against any person that is criminally convicted in connection with the fraud, in which case the statute of limitations shall start to run on the date on which the conviction becomes final".

Section 107 (Pub.L. No. 104–67, 109 Stat. 737, 758 (Dec. 22, 1995).

Congress intended this language to not only remove securities fraud as a predicate act under civil RICO, but also to prevent the pleading of "other specified offenses, such as mail and wire fraud, ... if such offenses are based on conduct that would have been actionable as securities fraud." H.R.Conf.Rep. No. 369 at 47. U.S.Code Cong. & Admin.News 679 at 725. Therefore, if the Act applies retroactively to this case, plaintiffs' RICO claims could not be brought, since they are based on securities fraud.

Section 108 of the Act addresses the issue of applicability:

### SEC. 108. APPLICABILITY

The amendments made by this title shall not affect or apply to any private action arising under title I of the Securities Exchange Act of 1934 or title I of the Securities Act of 1933, *commenced before and pending on the date of enactment of this Act.*

Pub.L. No. 104–67, 109 Stat. at 758 (1995) (emphasis added).

This section thus makes it clear that the Act applies only prospectively to actions under the securities laws. It is silent on the question of whether the Act applies only prospectively to actions brought under civil RICO or retroactively as well.

The defendants contend that "because Congress expressly provided for prospective application in Section 108 for lawsuits arising under the securities laws, it should be inferred from its failure to so provide for

lawsuits arising under RICO that Congress intended the opposite for the RICO amendment in the immediately preceding Section 107." The plaintiffs respond that this interpretation "would require this Court to conclude that Congress inexplicably chose an "indirect" route to *retroactively* abolish *pending* civil RICO actions based on securities fraud predicate acts. If Congress had truly sought to distinguish Section 107 from Section 108's clearly expressed *prospective* application, it could have inserted the appropriate retroactive language in either statutory provision . . ."

### 1. The Legislative History

Section 107 was an amendment to the securities bill which was proposed by Representative Cox of California on March 6 and voted upon the next day, without any hearings or testimony. Cox contended in the House debate that the amendment had been "inadvertently left out of the bill when we combined the Commerce and Judiciary portions." (H2765.) Opponents of the amendment attacked it vigorously on the ground that no one really had had a chance to examine it:

> This amendment is not based upon any hearings, it is not based upon any jurisprudential, it is not based upon any data, any economic study, it is based upon an idea those guys had late last night. (Rep. Bryant, H2777.)

> Is it proper for this Congress to take up an issue of such a magnitude with no hearings . . . To then come out here with a [sic] historic amendment to a separate piece of legislation with the Committee on Rules having a special hearing last night to put in order a nongermane amendment to a piece of legislation that has nothing to do with the business, and then asking our Members to rush out here at 6:30 and cast a vote on that, it is unfair. It is wrong. (Rep. Markey, H2777.)

In one of these attacks, Representative Conyers provided one of the few clues as to whether the bill was intended to apply retroactively:

> . . . this amendment, we must never forget, has arrived here by extraordinary means. It was accidentally, just like when you sweep up trash at night in the Committee on the Judiciary. This little slip of paper called RICO fell to the ground in a corner. Nobody noticed it, and, therefore, we have a whole securities bill that went to the Committee on Rules, was dealt with, and then the Committee on Rules came back again and said, "Oh, we overlooked civil RICO, and we have an amendment, not to modify it as it applies to securities, which has been the main use of civil RICO in securities ever since RICO was started . . . We now have a measure in one sentence that will remove it from all securities legislation *from this point on.* (Rep. Conyers, H2773) (emphasis added).

Although neither proponents nor opponents of the measure made any explicit reference to the question of whether the provision would permit pending actions to continue, both sides refer to the provision as putting a stop to RICO suits with securities fraud as predicate acts:

> What we are saying is that all of the major fraud cases in which RICO busted people who were bilking millions of dollars . . . is now going to be thrown in the trash heap and we will not need it anymore. (Rep. Conyers, H2773.)

> I intend to introduce RICO reform. It is my hope that the subcommittee will bring forward legislation to help ensure that the RICO statutes are used in the manner that Congress originally intended. In the interim, however, this amendment will stop some of the most egregious abuses of the civil RICO statute. (Rep. McCollum, H2774.)

> This amendment will put an immediate stop to one of the greatest abuses of the civil RICO statute. (Rep. McCollum, 2774.)

The proponents of Section 107 repeatedly argued that the amendment was necessary in order to prevent attorneys from using civil RICO to avoid the reforms of the new law:

> Without this amendment, this reform is meaningless. Lawyers can simply continue to do, as some have suggested they will do, and that is use the treble damage approach of RICO statute to avoid the

reforms of this legislation and, therefore, continue to wreak havoc upon a legal system that is creating some awful problems for us in the marketplace. (Rep. Tauzin, H2776.)

... the failure to adopt this amendment would undermine the reforms we are hoping to achieve because attorneys could then do an end run around all of the reform by simply using the RICO statute ... a plaintiff's attorney alleging a single violation of the securities law will be able to bring an action under civil RICO and leverage a hefty settlement from an innocent victim ... (Rep. Cox H2771.)

Lawyers who actually use this system today and who want to fight these reforms would love to have somewhere else to go, some other system, and using the civil RICO is the way they might go. This amendment needs to be passed. (Rep. Tauzin, H2776.)

### 2. Relevant Case Law

This legislative history is significant only in so far as it relates to the standards for ascertaining retroactivity, as delineated by the Supreme Court in *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994) and *Rivers v. Roadway Express, Inc.,* 511 U.S. 298, 114 S.Ct. 1510, 128 L.Ed.2d 274 (1994).

■ In *Landgraf,* the Court offered the following standard for determining retroactivity:

When ... the statute contains no ... express command, the court must determine whether the new statute would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id.* at ——, 114 S.Ct. at 1505. In this case, the RICO amendment does not "increase a party's liability for past conduct" or "impose new duties with respect to transactions already completed." It does, however, impair the plaintiffs' ability to recover for actions which may have violated federal law because it would strip the plaintiffs' complaint of RICO claims after the statute of limitations for securities fraud claims has likely expired. As a result, the statute should not function retroactively without a clear expression of congressional intent. *Id.*

■ The only district court to address the question of whether there was a clear expression in this statute stated, "although Congress deliberately chose not to apply the expansive securities law changes retroactively, it did not similarly express its intent with respect to RICO actions standing alone." *District 65 Retirement Trust for Members of the Bureau of Wholesale Sales Representatives v. Prudential Securities, Inc.,* 925 F.Supp. 1551 (N.D.Ga.1996). Defendants contend, in response, that by negative implication, Congress actually did express its intent—if it wanted the RICO statute to apply only prospectively, like the rest of the provisions, it would have included RICO in Section 108.

However, in *Landgraf,* the Supreme Court specifically considered, and rejected, the same "negative implication" argument offered here by defendants:

Applying the entire [Civil Rights Act of 1991] to cases arising from preenactment conduct would have important consequences, including the possibility that trials completed before its enactment would need to be retried ... Given the high stakes of the retroactivity question [and] the broad coverage of the statute ... it would be surprising for Congress to have chosen to resolve that question through negative inference drawn from two provisions of quite limited effect.

*Id.* at —— ——, 114 S.Ct. at 1493–94. There are also "important consequences" in this case, as the Northern District of Georgia pointed out:

to apply the statute retroactively in light of the Supreme Court's admonition that retroactive application is disfavored, would work a "manifest injustice" on plaintiffs. No expectations of defendants are altered by this decision. Upon filing of the complaint, defendants were on notice that such

claims may be brought, and it was not until after the Court rendered its decision on defendants' first motion to dismiss that they raised this objection. By following the Supreme Court's presumption against retroactivity in this case, defendants' burdens are in no way aggravated.

*Prudential Securities*, 925 F.Supp. at 1570.

Notwithstanding this conclusion, the Northern District of Georgia found that the retroactivity question "is a controlling issue of law to which there is substantial grounds for difference of opinion. Immediate appeal of this order may materially advance the ultimate termination of this case." *Id.*

One of the reasons for this finding, and probably the strongest argument for retroactive application here, is that this amendment to RICO had wide and longstanding support among members of the judiciary and the Chairman of the SEC. The House Debate included a number of quotations discussing the importance of altering RICO to exclude securities fraud as a predicate act. These quotations may support the urgency of altering RICO and the notion that Congress intended an immediate halt (including pending cases) to what it considered an extremely deleterious use of the statute:

> [O]ne of the proliferating developments in civil litigation has been the use of RICO * * * in civil claims, in routine commercial disputes, including those arising under the federal securities laws. I think that the proliferation of these claims and the use of a law that was designed to eliminate organized crime is a very bad influence on the

commercial community." (Judge Milton Pollack, H2773.)

> I have a feeling about RICO in the civil world * * * as being the most conspicuous case I know of legislation requiring Congressional attention to revision. (Simon Rifkind, Esq. H2773.)

> Many a prudent defendant, facing a ruinous exposure, will decide to settle even a case with no merit. It is thus not surprising that civil RICO has been used for extortive purposes, giving rise to the very evils it was designed to combat. (Justice Thurgood Marshall, H2775.)

> Beginning in 1985, former SEC Chairman John Shad testified before Congress in support of legislation to amend RICO in this way ... In 1989 SEC General Counsel, Dan Goelzer, testified before Congress in favor of this civil RICO reform, and today the SEC continues to support civil RICO reform. In testimony before our committee ... Arthur Levitt stated that H.R. 10 ... contained the kind of civil RICO reform that is necessary. (Rep. Cox, H2771.)

Also in support of finding retroactive application is the argument that Congress explicitly stated that the securities law provisions apply only prospectively and had it intended only prospective application of the RICO provisions it would have so written.[9]

### 3. Conclusion

The language of the statute expressly states that the provisions applicable to securities fraud actions do not apply retroactively. The statute does not address whether the provision applicable to RICO applies ret-

---

9. Support for this argument is found in a Practicing Law Institute article entitled, *The Private Securities Litigation Reform Act of 1995: Civil RICO Reform*, 923 PLI/Corp 623 (1996). In this article, Gary Lynch and Thomas Ogden write:
The amendments to civil RICO ... are not amendments to either of the cited federal securities laws, and the Act is silent as to the effect of the civil RICO amendment on pending actions. Longstanding principles of statutory construction suggest that the Act has cut off pending civil RICO claims based on allegations of securities fraud. *See Bruner v. United States*, 343 U.S. 112, 72 S.Ct. 581, 96 L.Ed. 786 (1952) ("when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall within the law")

... It would appear that the amendment to civil RICO jurisdiction falls within this doctrine ...
This argument relies on the following exception, put forth in *Landgraf*, to the rule that retroactivity requires a clear indication of Congressional intent: courts may apply "intervening statutes *conferring or ousting jurisdiction,* whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." *Id.* at ——, 114 S.Ct. at 1501. (emphasis added)
Plaintiffs respond to this argument, which is also offered in the defendants' memorandum, by suggesting that Section 107 is not a jurisdictional provision, but "rather, it restricts RICO's definition of "racketeering activity."

roactively or not. It is possible that this failure to provide a clear expression of intent resulted from the rushed nature of the debate and the proposal of the amendment. Whatever the reason, the statute does not include the type of clear expression that the RICO provision is to apply retroactively required under the *Landgraf* decision.

**B. RICO Elements**

In addition to attacking the plaintiffs' RICO claims on jurisdictional grounds, Polaris has also questioned the viability of plaintiffs' claims based on other elements of RICO. Count I of the Consolidated Complaint asserts claims against Polaris arising out of alleged violations of § 1962(c) and (d) of RICO. Count II asserts claims arising out of alleged violations of § 1962(a) and (d) of RICO. Count I is sufficiently alleged but Count II fails as a matter of law.

**1. Count I**

**a. 18 U.S.C. § 1962(c)**

■ 18 U.S.C. § 1962(c), requires an injury to plaintiffs' business or property resulting from "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985). Plaintiffs have alleged in sufficient detail each of these elements. The complaint charges that the Polaris Defendants created, operated, and controlled each of the six limited partnerships in this case, thereby satisfying the Supreme Court's "operation or management" test. *See Reves v. Ernst & Young*, 507 U.S. 170, 182, 113 S.Ct. 1163, 1172, 122 L.Ed.2d 525 (1993); *Napoli v. United States*, 32 F.3d 31, 34–36 (2d Cir.1994), *cert. denied*, —— U.S. ——, 115 S.Ct. 900, 130 L.Ed.2d 784 (1995).

Furthermore, these partnerships fall "within the statutory definition of enterprise." *See Beauford v. Helmsley*, 865 F.2d 1386, 1391 (2d Cir.) (*en banc*), *vacated and remanded on other grounds*, 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989), *en banc decision adhered to on remand*, 893 F.2d 1433 (2d Cir.), *cert. denied*, 493 U.S. 992, 110 S.Ct. 539, 107 L.Ed.2d 537 (1989). At least one court has already held that the Polaris partnerships could constitute enterprises within the meaning of RICO. *See Gervase v. Superior Court*, 31 Cal.App.4th 1218, 1239, 37 Cal.Rptr.2d 875, 889 (1995).

Finally, the consolidated complaint alleges in detail acts of supposed mail and wire fraud, as well as securities fraud, which continued for a period of more than six years. The predicate acts of mail and wire fraud involve the defendants' alleged efforts to conceal fraud (i) through the distribution of misleading information about the value of the limited partnership units and (ii) the return of a portion of investors' money to them, purporting to be distributions of income. The predicate acts of securities fraud involve alleged violations of § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77(1)(2), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. These allegations are sufficient to constitute a pattern as required under the statute. *See Rohland v. Syn–Fuel Assocs.–1982 Ltd. Partnership*, 879 F.Supp. 322, 334 (S.D.N.Y.1995).

**b. 18 U.S.C. § 1962(d)**

§ 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsections (a), (b), or (c) of this section." In the complaint, plaintiffs have alleged an agreement among the defendants to engage in such a conspiracy to violate subsection (c). *See* Consolidated Complaint at ¶ 136. This allegation, coupled with plaintiffs' submissions to the court demonstrating the relationships among the defendants within the alleged scheme, is sufficient to defeat summary judgment on Count I.

**2. Count II**

**a. 18 U.S.C. § 1962(a)**

■ To maintain an action under § 1962(a), a plaintiff must allege "first, that the defendants used or invested racketeering income to acquire or maintain an interest in the alleged enterprise, and second, that the plaintiff suffered injury as a result of that investment by defendants." *O & G Carriers, Inc. v. Smith*, 799 F.Supp. 1528, 1542 (S.D.N.Y.1992).

Although plaintiffs make an allegation that defendants invested racketeering proceeds in the Polaris partnership, they fail properly to allege an injury therefrom. In *O & G Carriers, Inc.*, the court noted:

> Plaintiffs' claim is not that they were injured by defendants' investment in or acquisition of an enterprise. Instead, the claim is that the alleged predicate acts induced plaintiffs to invest in the [suspect] partnerships. 'As the [amended] complaint does not ... allege any damages other than the loss of their investments, and since it is clear that these injuries arise out of the commission of the [alleged] predicate acts [of fraud], and not from any investment by the defendants of the racketeering proceeds,' plaintiffs have not alleged a § 1962(a) claim.

*Id.* at 1543. (citations omitted). Similarly, in the present case, the injury alleged by the plaintiffs is the purchase of unsuitable investments and subsequent losses based on fraudulent sales and offering materials. This injury was due to the predicate acts of fraud and not the subsequent investment of racketeering income back into the partnerships. The investment-injury requirement "is not satisfied merely because the defendant/enterprise has reinvested money from the racketeering acts back into its own operations, thus enabling the scheme to continue." *Update Traffic Systems v. Gould*, 857 F.Supp. 274 (E.D.N.Y.1994). As a result, the plaintiffs' claim under Count II is not sufficiently pleaded as a matter of law.

## VI. Common Law Claims

■ The named plaintiffs were all residents of Arizona at the time of their purchases. The purchases occurred on the following dates: (i) Richard C. Howland, June and July 1989; (ii) Lois McCrea, 1986; and (iii) Leonard Nordness, December, 1985. In weighing the various common law claims, the Court must apply the shorter of the limitations period set forth in the New York statute or the statute of the state in which the cause of action accrued. *See CPLR 202* (New York's borrowing statute); *Block v. First Blood Assoc.*, 988 F.2d 344, 349 (2d Cir.1993).

Count VI of the complaint alleges common law fraud. Actions for common law fraud in New York must be brought within six years of the commission of the fraud or two years from its actual or imputed discovery. CPLR § 203(g), 213(8). Common law fraud in Arizona is subject to a three year statute of limitations. Ariz.Rev.Stat.Ann. § 12–543.

Count VII of the complaint alleges common law negligent misrepresentation. Actions for negligent misrepresentation in New York must be brought within three years for an "action to recover damages for an injury to property ..." CPLR § 214(4). Negligent misrepresentation is subject to a two year limitations period in Arizona. Ariz.Rev.Stat. Ann. § 12–542.

Count VIII of the complaint alleges common law breach of fiduciary duty. This type of action is subject to a three-year limitations period in New York since plaintiffs' claim neither seeks equitable relief nor is based on a contractual relationship between the parties. CPLR § 214(4). In Arizona, there is a two-year limitations period for breach of fiduciary duty. Ariz.Rev.Stat.Ann. § 12–542.

The Court need not reach the issue of which state's statute of limitations applies. Both Arizona and New York courts have developed notions of tolling in the context of alleged fraud. In New York, the statute of limitations does not begin to run on a fraud cause of action until the plaintiff, with reasonable diligence, could have discovered the fraud. *Schmidt v. McKay*, 555 F.2d 30, 36–37 (2d Cir.1977). Furthermore, "mere suspicion will not suffice as a ground for imputing knowledge of the fraud." *Id.* at 37. In Arizona, acts of concealment of a fraud tolls running of the limitations period until a plaintiff could have learned of the fraud through reasonable diligence. *Coronado Dev. Corp. v. Superior Court*, 139 Ariz. 350, 678 P.2d 535 (App.1984). Similarly, in both states, actions sounding in fraud, such as embezzlement or breach of fiduciary duty, may also be subject to tolling. *See, e.g., Estate of Kirschenbaum v. Kirschenbaum*, 164 Ariz. 435, 793 P.2d 1102 (App.1989); *Schmidt*, 555 F.2d at 36–37.

As discussed above, this Court cannot find that plaintiffs were, as a matter of law, on

inquiry notice of the alleged fraud in the case upon their receipt of prospectuses. If plaintiffs did not receive inquiry notice until October, 1990, when capital losses were first suffered as a result of the sale of Polaris aircraft or January, 1992, when the format of Prudential's monthly statements was altered so that the value of investments was no longer recorded at par, then at least some of the common law claims are timely. As a result, awarding summary judgment on these claims at this time is inappropriate.

█ Finally, Count XI of the complaint alleges violations of the New Jersey RICO statute. The application of this statute to alleged wrongful conduct occurring outside New Jersey involving plaintiffs who were not residents of New Jersey at the time of their purchases would violate due process. *See Allstate Ins. Co. v. Hague,* 449 U.S. 302, 308, 101 S.Ct. 633, 637–638, 66 L.Ed.2d 521 (1981) (state must have contact with the parties and events giving rise to the litigation in order to apply the law of that state). Summary judgment is due to the defendants on this count.

## VII. Conclusion

Summary judgment for the defendants is denied on Counts I, VI, VII, VIII of the Consolidated Complaint. It is granted on Counts II and XI. Submit order accordingly.

SO ORDERED.