383 F.Supp.2d 428 (2003)
SPENCER TRASK SOFTWARE AND INFORMATION SERVICES LLC, formerly known as Spencer Trask Internet Group, LLC; and Spencer Trask Ventures, Inc., Plaintiffs,
v.
RPOST INTERNATIONAL LIMITED; Zafar Kahn; Terry Tomkow; and Ken Barton, Defendants.
No. 02 Civ. 1276(PKL).
United States District Court, S.D. New York.
January 24, 2003.
*429 *430 *431 *432 *433 *434 Patterson, Belknap, Webb & Tyler LLP, New York City, Steven P. Younger, Jon-Peter F. Kelly, for Plaintiffs.
Stillman & Friedman, P.C., New York City, John B. Harris, Hill & Barlow, P.C., Boston, MA, Daniel C. Winston, David S. Friedman, for Defendants.[1]

OPINION AND ORDER
LEISURE, District Judge.
Defendants RPost International Limited, Zafar Kahn, Terry Tomkow, and Ken Barton (collectively "RPost") move to dismiss this action brought by Spencer Trask Software and Information Services, LLC and Spencer Trask Ventures, Inc. (collectively "Spencer Trask"), pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons stated below, defendants' motion to dismiss is granted in part and denied in part.
*435 On February 11, 2002, Spencer Trask filed its initial complaint in New York Supreme Court for, inter alia, breach of contract, promissory estoppel, unjust enrichment and breach of warranty. After RPost removed the action to this Court, the Court denied a motion for a temporary restraining order seeking to enjoin RPost's Series C financing, principally on the ground that Spencer Trask had not shown irreparable harm. Defendants then moved to dismiss, or in the alternative, for summary judgment.
Thereafter, on March 18, 2002, plaintiffs filed an Amended Complaint, adding claims for securities fraud and common law fraud. As a result, defendants withdrew their motion to dismiss in order to address the new issues raised in the plaintiffs' Amended Complaint. Defendants then brought this motion to dismiss the plaintiffs' Amended Complaint, and moved this Court for a stay of discovery during the pendency of their motion to dismiss. On April 8, 2002, the Court granted the latter portion of said motion and entered a stay of discovery pending disposition of the motion to dismiss.

BACKGROUND
On a motion to dismiss, the plaintiffs' well-pleaded allegations in their Amended Complaint are assumed to be true. Rothman v. Gregor, 220 F.3d 81, 91 (2d Cir.2000). Therefore the relevant facts, as alleged by the plaintiffs in their Amended Complaint, are as follows. Spencer Trask is an experienced venture capital investor that provides financing for emerging companies, particularly in the technology sector, and in return, Spencer Trask generally receives company stock. Plaintiffs' First Amended Complaint ("Am.Comp.") ¶ 19. RPost is a start-up internet company which aims to provide an electronic mail service for sending "registered e-mails" with security similar to registered mail sent through traditional postal services. Id. ¶ 20. In July 2001, RPost circulated an offering memorandum (the "July Memorandum") among investors, seeking investors to complete its Series B round of financing-a private placement of convertible debt of up to $2 million. The proposed terms for investment called for the Series B notes to convert into shares in RPost at a 50% discount to the closing price in RPost's later Series C round of financing. The July Memorandum made numerous representations about the company: listing the "Directors and Advisors" of RPost and describing their backgrounds, and including in that group Marvin Runyon, a former Postmaster General of the United States. Id. ¶ 22. The July Memorandum also listed Brigadier General Richard W. Pryor (Ret.), a former President of Worldcom, as the "Interim CEO" of RPost, and included him in the list of people identified under a heading titled "Team  Founders and Leadership Team". Id. ¶ 23. The July Memorandum made representations concerning RPost's relationship with the United States Postal Service (USPS), stating that RPost offered registered e-mail "in partnership with the USPS," and representing that their "partnership was on the cusp of completion." Id. ¶ 25. Furthermore, the July Memorandum made representations concerning RPost's capitalization, stating that the authorized capital stock of the company consisted of 120,000,000 "ordinary" shares, of which approximately 21,000,000 were issued and outstanding. Id. ¶ 27.
On August 13, 2001, Kevin Kimberlin, Chairman of Spencer Trask & Co., and Danny Zottoli, Chief Executive Officer of Information Services, met with defendants Kahn and Barton, two of the three founders of RPost. Kahn explained that RPost was raising a "Series B" round of financing, but was in need of further financing to *436 close out that round. Id. ¶ 30. Kahn represented that RPost expected to sign in 60 days a final operational contract with the USPS, which would give RPost the exclusive use of the USPS brand for the provision of USPS electronic registered mail. Id. Spencer Trask expressed its willingness to provide financing, but only if terms could be reached that ensured that Spencer Trask would have a sufficient stake in the company to justify the risk it would be taking. Id. ¶ 31. On August 22, 2001, the parties met again, and reached an agreement on terms for the investment by Spencer Trask ("August Agreement"). Id. ¶ 36. The proposed terms for the investment provided that: (1) Spencer Trask would provide RPost with $500,000 in Series B financing, subject only to Spencer Trask's due-diligence review; (2) Information Services would purchase, subject to due diligence, 6% of the fully-diluted outstanding capital stock from each of the three founders for $1.8 million, with Spencer Trask having the right to purchase the shares in three separate tranches over an 18 month period; (3) Spencer Trask would raise or invest $1 million for RPost in its subsequent Series C round of financing provided that two conditions were met: (a) RPost did in fact enter into an exclusive contract with the USPS; and (b) that before March 1, 2002, RPost also raised $1 million of Series C financing from other investors at a pre-money valuation of $30 million or less; and (4) Spencer Trask agreed to make a non-binding commitment to use its best efforts to raise funds for RPost's Series D round of financing. The overall result of the agreed structure was to give Spencer Trask the right to acquire over 20% of RPost stock. Kahn and Kimberlin shook hands on the deal and Kimberlin congratulated Kahn on becoming a partner with Spencer Trask. Id. ¶ 38. That same day, in response to a request by Spencer Trask, Kahn sent an e-mail representing that "[t]he total issued and outstanding shares in the company, RPost International Limited ... are 22,336,000." Id. ¶ 40. Spencer Trask relied on this figure in calculating how many shares would be purchased from each founder in the August Agreement. Id.
After Kimberlin and Kahn shook hands on the August Agreement, Kimberlin asked Zottoli to draw up the terms to which they had agreed. David Hochman, a Managing Director at Spencer Trask & Co., drew up four short letter agreements to document the deal; and Hochman and Zottoli then telephoned Kahn and walked him through each sentence reflected in the letter agreements. Kahn told them that the terms in the letters were satisfactory. Hochman then sent the draft letter agreements to Kahn via e-mail on August 23, 2001. These proposed letter agreements summarized the parties' discussions regarding Spencer Trask's purchase of the founders' shares in RPost, provided for payment of $200,000 in cash by Spencer Trask "[o]n execution," and concluded with the sentence, "We are prepared to move promptly to consummate this transaction following the execution of this letter." Draft agreements, attached as Ex. B to Affidavit of Kevin B. Kimberlin ("Kimberlin Aff.")
Over the next two months, RPost proposed some revisions to the terms of the August Agreement, some of which were material, but Spencer Trask did not accept the material changes. Am. Comp. ¶ 43. The parties never signed or executed any of the four letter agreements written by Hochman. RPost did not provide Spencer Trask with due-diligence materials until the second week of October, a full month after RPost had assured Spencer Trask that those materials would be sent, and those materials did not include several of the documents needed by Spencer Trask *437 in order to complete their due diligence. In a telephone call on October 26, 2001, Kahn emphasized the urgency of closing Spencer Trask's Series B investment due to the imminence of RPost's signing an exclusive agreement with the USPS. Id. ¶ 48. On October 30, 2001, Kahn sent Spencer Trask a letter urging Spencer Trask to provide the Series B financing right away, stating that it was closing financing that week; and on November 1, 2001, Spencer Trask invested $500,000 in RPost's Series B round of financing. In exchange, Spencer Trask received a subordinated promissory note (the "Promissory Note") that was convertible into preferred shares of RPost, the amount of which would be determined by the Series C financing, and the parties executed a Subordinated Convertible Debt Agreement (the "Debt Agreement") on November 1, 2001. Id. ¶ 50. In the October 30, 2001 letter, RPost represented that it had 9,624,000 "authorized options in stock option reserve"; but in the Debt Agreement signed on November 1, 2001, RPost represented that it had 3,630,000 authorized options in reserve. Id.
On December 20, 2001, RPost sent Spencer Trask another offering memorandum, which was dated November 2001 (the "November Memorandum"). Like the July Memorandum, the November Memorandum made various representations concerning RPost's management; its relationship with the USPS; and its capital structure. Am. Comp. ¶ 51.
Despite Spencer Trask's repeated reminders of the need to receive additional information from RPost in order to complete the due diligence needed in order to close the August Agreement, defendants delayed providing that information and scheduling interviews, such that the due diligence was only finalized on January 9, 2002. Id. ¶ 66. However, on January 15, 2002, when Kimberlin met with Khan and Barton and stated that Spencer Trask was ready to proceed to the final closing of the remaining phases of the August Agreement, Barton told Kimberlin that their circumstances had changed and that they "did not need" that deal anymore. Id. ¶ 67.
In February 2002, Spencer Trask asked RPost a series of questions concerning its capitalization structure and corporate governance. Spencer Trask responded to those questions in a letter dated February 22, 2002, via its counsel Hill & Barlow, with the following information: (1) RPost had 21,645,000 shares of common stock issued and outstanding; (2) RPost had outstanding options exercisable for 686,000 shares of common stock; (3) RPost had reserved 9,564,000 additional shares under its option plan; (4) the three founders of the company-defendants Tomkow, Khan and Barton-were the only members of RPost's board of directors; (5) RPost did not have an "Executive Committee"; (6) neither Mr. Runyon nor General Pryor were "current statutory officers" of RPost. Id. ¶ 69. In addition, the plaintiffs alleged that they learned information about the qualifications and background of Kahn and Barton that made RPost's representations regarding these individuals in the July and November appear misleading. Id. ¶ 71. Plaintiffs continue to allege that as of March 12, 2002, RPost had still not finalized any agreement with the USPS. Id. ¶ 73.

DISCUSSION
A. Motion to Dismiss Standard
The Court may grant a motion to dismiss only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *438 see also Lipsky v. Commonwealth United Corp., 551 F.2d 887, 894-95 (2d Cir.1976). The Court must read the complaint generously and draw all reasonable inferences in favor of the plaintiff, accepting the complaint's allegations as true. Conley, 355 U.S. at 46-46, 78 S.Ct. 99; Hosp. Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976); Dubin v. E.F. Hutton Group, Inc. 695 F.Supp. 138 (S.D.N.Y.1988). Accordingly, the factual allegations set forth in the Amended Complaint do not constitute findings of fact by the Court, but rather are presumed to be true for the purpose of deciding the motion to dismiss. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 165 F.Supp.2d 615, 625 (S.D.N.Y.2001). Thus, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).
In deciding a motion under Rule 12(b)(6), the Court may consider only the facts stated on the face of the complaint, documents appended to the complaint or documents incorporated by reference in the complaint. Schnall v. Marine Midland Bank, 225 F.3d 263, 266 (2d Cir.2000). "[T]he complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." Cortec Indus., Inc. v. Sum Holding L.P., 949 F.2d 42, 47 (2d Cir.1991); Fed.R.Civ.P. 10(c). When a party introduces matters extraneous to the pleadings, the Court must convert the motion to dismiss into a motion for summary judgment or exclude certain matters from consideration. See Fonte v. Bd. of Managers of Cont'l Towers Condominium, 848 F.2d 24, 25 (2d Cir.1988); Fed. R.Civ. P. 12(b). However, the Second Circuit has held that "when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint," the court may nevertheless take that document into consideration in deciding the defendants' motion to dismiss, without converting the proceeding to one for summary judgment. Cortec Indus., 949 F.2d at 47-48; see also Int'l Audiotext Network, Inc. v. AT & T Co., 62 F.3d 69, 72 (2d Cir.1995).[2]
*439 B. Claim I: Breach of Contract
Spencer Trask asserts several claims seeking to enforce the alleged August Agreement with RPost: breach of contract, breach of implied contract, promissory estoppel, unjust enrichment, and breach of the duty of good faith and fair dealing. Defendants argue that all of Spencer Trask's contract-based claims fail for two reasons: (1) the Amended Complaint and incorporated documents conclusively establish the absence of any claims as matter of law; and (2) the Statute of Frauds bars all of those claims. The Court will first address whether the Amended Complaint and the incorporated documents establish a claim upon which relief can be granted.
Defendants contend that the facts as alleged in the Amended Complaint and the documents incorporated by reference into the complaint show, as a matter of law, that RPost did not manifest an intent to enter into a binding agreement in their conversations with Spencer Trask on August 22, 2001, and therefore, Spencer Trask and RPost did not enter into a binding agreement as result of their oral discussions and handshake on that date. Consequently, defendants contend that plaintiffs cannot state a claim for breach of contract. While plaintiffs assert that the parties did enter into a binding preliminary agreement in their conversation on August 22, 2001, they argue that the issue of whether or not the parties intended to be bound in their August Agreement, and consequently, whether the August Agreement constitutes an enforceable contract, cannot be determined as a matter of law at this early stage of the litigation. See Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the First Amended Complaint ("Pl.Opp.") at 13. While the Court can make the determination of whether the parties intended to be bound in an alleged preliminary agreement on a motion to dismiss, courts are often reluctant to rule on the issue of intent to form a binding agreement in a judgment on the pleadings, and must be cautious in making such determinations. Advanced Marine Techs., 16 F.Supp.2d at 381 n. 27. In Advanced Marine Techs., the Court granted a 12(b)(6) motion to dismiss a breach of contract claim after concluding that the plaintiff could allege no set of facts to show that the defendants intended to be bound in their preliminary agreement. In that case, the Court disagreed with the plaintiff's interpretation of the Second Circuit's language in Consarc Corp. v. Marine Midland Bank, 996 F.2d 568 (2d Cir.1993), suggesting that summary judgment and, by a parity of reasoning, a motion to dismiss, may never be granted on the issue of intention to be bound. The Court stated that the proper reading of the language in Consarc would merely indicate that "courts must be cautious in granting summary judgment, perhaps especially so where the issue is intent, but summary judgment nevertheless may be appropriate in such a case if there is no genuine issue of material fact for trial." Advanced Marine Techs., 16 F.Supp.2d at 381 n. 27. However, in cases where the intent to be bound is not conclusively determinable based on the facts alleged in the complaint and the documents incorporated by reference, "the issue of whether and when the parties intended to be bound is a factual issue that should [be] submitted to the jury." Int'l Minerals & *440 Res., S.A. v. Pappas, 96 F.3d 586, 593 (2d Cir.1996).
Under New York contract law, parties may enter into a contract orally, even though they contemplate later memorializing their agreement in writing. See Ciaramella v. Reader's Digest Ass'n, 131 F.3d 320, 322 (2d Cir.1997).[3] In such a case, the mere intention to commit the agreement to writing will not prevent contract formation prior to the execution of that writing. Consarc, 996 F.2d at 574 ("Simply because the parties contemplate memorializing their agreement in a formal document does not prevent their agreement from coming into effect before written documents are drawn up. That is, if the parties have settled on the contract's substantial terms, a binding contract will have been created, even though they also intended to memorialize it in a writing.") (citations omitted)); R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 74 (2d Cir.1984). If, however, either party communicates an intent not to be bound until he achieves a fully executed document, "no amount of negotiation or oral agreement to specific terms will result in the formation of a binding contract." Winston v. Mediafare Entm't Corp., 777 F.2d 78, 80 (2d Cir.1985) (citing R.G. Group, 751 F.2d at 74 ("Under New York law, if the parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs.")). "It is the intent of the parties that will determine the time of contract formation." Id. at 78.
In general, "preliminary manifestations of assent that require further negotiation and further contracts do not create binding obligations." Shann v. Dunk, 84 F.3d 73, 77 (2d Cir.1996). However, the Second Circuit has recognized that in some rare instances, if a preliminary agreement clearly manifests the intent of the parties, it can create a binding obligation. See id; Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 72 (2d Cir.1989). Noting that it is a rare instance in which a preliminary agreement clearly manifests such an intention as to create a binding obligation, Judge Pierre N. Leval, then a District Court judge, helpfully outlined two separate categories of such binding preliminary contracts. See Teachers Ins. & Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491, 497-99 (S.D.N.Y.1987). The first type is a fully binding preliminary agreement, which is created when the parties have agreed upon all essential terms, but agree to memorialize their agreement in a more formal document. See Adjustrite Sys., Inc. v. GAB Bus. Services, Inc., 145 F.3d 543, 548 (2d Cir.1998). "A binding preliminary agreement binds both sides to their ultimate contractual objective in recognition that, `despite the anticipation of further formalities', a contract has been reached." Id. (citing Tribune, 670 F.Supp. at 498). The second type of preliminary agreement, termed by Judge Leval as a "binding preliminary commitment," is created when the parties agree on certain major terms but leave other terms open for negotiation, accepting "a mutual commitment to negotiate together in good faith in an effort to reach final agreement." Tribune, 670 F.Supp. at 498. "In contrast to a fully binding preliminary agreement, a `binding preliminary commitment' does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the ... objective within *441 the agreed framework." See Adjustrite, 145 F.3d at 548.
The key issue, in finding that the plaintiffs have stated a claim for either type of agreement, is whether the parties intended to be bound by that preliminary agreement. See Adjustrite, 145 F.3d at 548. In ascertaining whether the parties evinced this intention to be bound, the court must look to "the words and deeds [of the parties] which constitute objective signs in a given set of circumstances." R.G. Group, 751 F.2d at 74. Subjective evidence of intent, however, is generally not considered. See Adjustrite, 145 F.3d at 548; Rule v. Brine, Inc., 85 F.3d 1002, 1010 (2d Cir.1996). Instead, "[w]hat matters are the parties' expressed intentions, the words and deeds which constitute objective signs in a given set of circumstances." R.G. Group, 751 F.2d at 74. The analysis must not put "disproportionate emphasis ... on any single act, phrase or other expression, but, instead, [should consider] the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp., 41 N.Y.2d 397, 393 N.Y.S.2d 350, 352, 361 N.E.2d 999 (1977).
Plaintiffs have alleged that the parties entered into a fully binding preliminary agreement in their oral agreement on August 22, 2001. Am. Comp. ¶ 2. In the alternative, plaintiffs argue that if the Court finds they have failed to state a claim that the parties entered into a fully binding preliminary agreement, the August Agreement represented a binding preliminary commitment between the parties, and as such that the defendants have breached their duty to negotiate in good faith under such a commitment. See Pl. Opp. at 18.
1) August Agreement Is Not a Binding Preliminary Agreement
The Court has identified four factors to be considered in determining whether parties to a preliminary agreement, which calls for the execution of a formal instrument, intended to be bound in the absence of such an executed final instrument. Adjustrite, 145 F.3d at 549. In Winston, the Court looked at the following four factors in determining whether the preliminary agreement between the parties represented a binding preliminary agreement: (1) whether the parties have expressly reserved the right not to be bound without a written contract; (2) whether there has been partial performance of the contract; (3) whether the parties have agreed to all terms of the alleged contract; and (4) whether the alleged agreement is the type that is usually committed to writing. See 777 F.2d at 80. This Court has also found the Winston factors to be instructive in determining whether a preliminary agreement should be considered binding as a preliminary commitment to negotiate in good faith, altering the factors considered only slightly and placing less of a focus on the existence of unresolved terms between the parties. See Tribune, 670 F.Supp. at 499-503. In the analysis of both these types of binding agreements, the Court has found the language of the agreements to be the most important factor in discerning the parties' manifested intent. See id. at 499. In this case, that is a bit more difficult since the alleged agreement was an oral agreement and the only evidence we have of its language is the language of the draft agreements, which the plaintiffs allege embody the terms of the alleged oral agreement. See Am. Comp. ¶ 41.
a) Express Reservation of Right Not to Be Bound Absent a Writing
While there was not an express reservation of the right not to be bound in the *442 draft Agreements, there was such a reservation in the July Memorandum, and there were several expressions of the mutual intent not to be bound prior to the execution of the draft agreements. See July Memorandum at 4; Draft agreements. The draft agreements, the terms of which were allegedly agreed to by both parties over the telephone after Hochman and Zottoli "walked Kahn through each sentence reflected in the agreements," Am. Comp. ¶¶ 41, 42, were sent via e-mail to the defendants the day after the alleged oral agreement. Those agreements laid out the terms agreed to in the alleged oral contract, and concluded with the sentence, "We are prepared to move promptly to consummate this transaction following the execution of this letter." Draft agreements (emphasis added). That is not the only reference to execution in these agreements, as the agreements include a requirement that Spencer Trask make a payment of $200,000 "[o]n execution." Id. Plaintiffs do not allege that they paid this money. Lastly, all four draft agreements contained blank signature lines with an open agreement date: "Agreed, as of August ____, 2001." Id. These provisions of the draft agreements, each sentence of which the plaintiffs allege were agreed to by both parties, "appear to place importance on the formalities of execution," thereby reflecting a mutual intent on the part of both parties not to be bound to the terms of the agreement until the agreement was executed. Winston, 777 F.2d at 82; Davidson Pipe Co., Inc. v. Laventhol & Horwath, 1986 WL 2201, *4 (S.D.N.Y. Feb. 11, 1986) (holding that similar provisions attach "great significance to the execution date" and may be viewed as "an impediment to forming a binding agreement prior to some formal time of execution" (quotations omitted)). Of those three provisions in the draft agreements, the critical language at the end of the agreements, indicating that the plaintiffs "were prepared to move promptly to consummate this transaction following the execution of this letter," is the strongest indication that the parties did not evince an intent to be bound prior to execution. See draft agreements (emphasis added); Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 262 (2d Cir.1984) (holding that a term stating the agreement would be effective "when executed" could conclusively establish that no binding force was intended prior to execution). This language is indistinguishable from terms that courts have found preclude a binding preliminary agreement as a matter of law. See R.G.Group, 751 F.2d at 76 (explicit wording of agreement declared that obligations would commence "when duly executed"); Davidson Pipe Co., 1986 WL 2201, at *4 (obligations started "[c]oncurrently with the execution and delivery of this Agreement").
Furthermore, the defendants did include an explicit reservation of their right not to be bound in the absence of a written agreement in the July Memorandum provided by RPost to Spencer Trask, which lay out the terms for deals involving investment in RPost's Series B round of financing. See July Memorandum at 4. The plaintiffs reviewed the July Memorandum and, as alleged in the Amended Complaint, relied heavily on the representations therein. See Am. Comp. ¶¶ 29, 21-28, 91(a)-(e), (g)-(j). In that Memorandum, RPost states, "We may not sell the convertible debt or accept any offer to purchase the convertible debt until we have delivered to you and you have executed the agreement reflecting the definitive terms and conditions of the offering." Id. at 4. Plaintiffs have alleged that their investment in the Series B financing was part of the August Agreement, therefore the provision of the July Memorandum, which applied to the sale or purchase of convertible *443 debt for that financing and explicitly reserved the defendants' right not to be bound absent a written agreement, is indicative of the defendants' objective intent not to be bound to a sale or purchase of convertible debt in the absence of a written agreement. See ABC Trading Co. v. Westinghouse Electric Supply Co., 382 F.Supp. 600, 602 (E.D.N.Y.1974) (rejecting an alleged oral agreement because an earlier letter from one of the parties, written three and one-half months before the alleged oral agreement, had said, "If your client finds this proposal agreeable in principle, we can proceed to reduce it to a written agreement.")
The plaintiffs place much weight on the defendants' admission that there was an "agreement on terms," and the fact that Kimberlin and Khan shook hands on the oral agreement made in the August 22, 2001 meeting, and plaintiffs argue that such an agreement should establish the parties' intention to be bound. However, such an agreement can only serve as an indication of the parties' intention to be bound, and cannot, as plaintiffs contend, conclusively establish that the parties intended to be bound.[4]See Tribune, 670 F.Supp. at 497 ("[M]ore is needed than agreement on each detail [to create a binding obligation. There must be] overall agreement ... to enter into a binding contract."); Arcadian Phosphates, 884 F.2d at 72. Their alleged oral agreement and handshake must be considered with all the other words and deeds of the parties, identifiable from the facts alleged in the Amended Complaint and the incorporated documents, and which would constitute objective signs of their intent to be bound. See, e.g., R.G. Group, 751 F.2d at 76 (Court held that parties' alleged handshake agreement on the deal was not sufficient to show a mutual intent to be bound in light of the reservation of that right in the parties' other deeds and words); Ciaramella, 131 F.3d at 325 (finding statement "[w]e have a deal" was not an explicit waiver of an express signature requirement); Davidson Pipe Co., 1986 WL 2201, at *5 (finding an oral statement "we have a deal" to be insufficient to bind parties who have reserved right to be bound only by an executed contract).
b) Partial Performance
The second factor looks to whether one party has partially performed, and that performance has been accepted by the party disclaiming the contract. See R.G. Group, 751 F.2d at 76. Partial performance is a significant factor in determining the existence of a binding oral agreement. See Cleveland Wrecking Co. v. Hercules Constr. Corp., 23 F.Supp.2d 287, 296 (E.D.N.Y.1998); see also Viacom Int'l Inc. v. Tandem Prod., Inc., 368 F.Supp. 1264, 1270 (S.D.N.Y.1974), aff'd, 526 F.2d 593 (2d Cir.1975). Plaintiffs contend that there has been partial performance of the August Agreement: Spencer Trask by investing $500,000 in RPost's Series B financing round and RPost by providing Spencer Trask with due diligence through January 2001. See Pl. Opp. at 16. Partial performance requires some actual performance of the contract, such that the plaintiffs must have conferred something of value upon the defendants *444 which the defendants accepted. Cleveland Wrecking Co., 23 F.Supp.2d at 296 (quoting P.A. Bergner & Co. v. Martinez, 823 F.Supp. 151, 157 (S.D.N.Y.1993)). While it is clear that the plaintiffs' investment of $500,000 did confer a benefit upon the defendants, the defendants assert that that investment was part of the contract signed by the parties in the Debt Agreement and therefore not indicative of the plaintiffs' performance of the August Agreement. Defendants argue that language in the Debt Agreement, stating that "This Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof," indicates that the plaintiffs' Series B investment was not part of a package deal, and should not be seen as partial performance of the August Agreement. Debt Agreement ¶ 9(e); see Def. Mem. at 16. Plaintiffs assert that this language does not preclude the Series B investment from being part of a larger package deal, because the language merely indicates that the Debt Agreement was the entire agreement with respect to the "subject matter hereof"-meaning the Series B round of financing that it governed. See Pl. Opp. at 21. Accordingly, it is not appropriate for the Court to make a conclusive determination of whether or not the language in the Debt Agreement bars the plaintiffs' investment from being seen as partial performance of the August Agreement at this early stage. Therefore, making all reasonable inferences in favor of the plaintiffs, the Court finds that the second factor slightly favors the plaintiffs.
c) Agreement on All Terms
Turning to the third factor, plaintiffs alleged that the parties reached an oral "agreement on terms," and that RPost thereafter proposed material revisions to those terms. Am. Comp. ¶¶ 37, 43.[5] While the Court must take as true the plaintiffs' allegation that the parties reached an agreement on terms, it appears from further allegations in the Amended Complaint that the parties were still negotiating several of these material terms. See Am. Comp. ¶¶ 43-44. It seems clear from the negotiations that ensued that the plaintiffs' alleged "agreement on terms" was not an agreement to all terms, and even drawing all reasonable inferences in favor of the plaintiffs, the Court cannot find that this factor weighs in favor of the plaintiffs. As the Second Circuit noted in Winston, "[t]he actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution. Details that are unnoticed or passed by in oral discussion will be pinned down when the understanding is reduced to writing." 777 F.2d at 82 (citing R.G. Group, 751 F.2d at 75). In this case, as in Winston, the drafting process revealed several points of disagreement, and as such the Court cannot find that the parties were able to reach an agreement on all terms in the alleged oral agreement. See Am. Comp. ¶ ¶ 43, 44.
d) Agreement Is Type Usually Committed To Writing
The fourth and final factor is whether the August Agreement is the type that is usually committed to writing. The alleged oral agreement was a complex, multi-stage package deal whereby Spencer Trask would invest or raise at least $1.5 million *445 in Series B and C financing, subject to extensive due diligence and to various pre-conditions and milestones for the Series C round; would have options to purchase $5.4 million worth of RPost founders' stock at three separate points over an 18-month period; and would have the right of first refusal on a Series D round at some point in the future. See Memorandum in Support of Motion to Dismiss the First Amended Complaint ("Def.Mem.") at 19; Am. Comp. ¶¶ 37-39. The Court agrees with the defendants that it "defies common sense that any sophisticated investor would ever expect to be able to agree to such a deal, or to be able to carry out and ever enforce such a deal, without a written contract." Def. Memo at 19; Adjustrite, 145 F.3d at 551 (holding that the agreement was clearly of the type that would ordinarily be committed to writing "in view of the size of the transaction, the nature of the assets being purchased, and the length of the employment contracts"). Plaintiffs argue that contracts for the sale of securities are often made orally, pointing to the Supreme Court's language in Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc., 532 U.S. 588, 121 S.Ct. 1776, 149 L.Ed.2d 845 (2001), noting in sweeping rhetoric that "oral contracts for the sale of securities are sufficiently common that the Uniform Commercial Code [UCC] and statutes of fraud in every State now consider them enforceable." Id. at 595, 121 S.Ct. 1776. Even drawing all reasonable inferences in favor of the plaintiffs, the Court does not find this consideration persuasive since it is not likely that those sufficiently common oral contracts for the sale of securities, to which the Supreme Court was referring, were intended to encompass such a complex transaction. While the plaintiffs may be able to establish that the August Agreement should be exempted from the Statute of Frauds under the UCC § 8-113 (the revised provision of the UCC allowing oral contracts for sales of securities to be enforceable), that would provide no more support for their argument that it was not a type of contract that normally would have been committed to writing. On the other hand, RPost's requirement, as stated in the July Memorandum, that any offer to purchase the convertible debt in the Series B round of financing, only one part of the alleged oral agreement, would need to be in writing, does serve as an indication that the alleged oral agreement is one that would have been committed to writing. See July Memorandum at 4. Therefore, even viewing all the facts alleged in the Amended Complaint and incorporated documents in a light most favorable to the plaintiffs, the Court finds that this factor weighs in favor of the defendants.
In sum, three of the four factors strongly point to the conclusion that the parties did not intend to be bound to the terms of the August Agreement in the absence of a written document. Even drawing all reasonable inferences from the partial performance alleged by the plaintiffs, the Court finds that that factor alone is insufficient to state a claim for relief. See Arcadian, 884 F.2d at 72-73 (affirming grant of summary judgment dismissing breach of contract action even though there was "considerable partial performance," where language of the memorandum showed that the parties did not intend to be bound until final contract was signed); Adjustrite, 145 F.3d at 551 (same). Therefore, based on the facts alleged in the Amended Complaint and the incorporated documents, the Court finds that the plaintiffs have failed to state a claim that the parties intended the August Agreement to be a binding preliminary agreement.
2) August Agreement May Represent a Binding Preliminary Commitment
In considering whether the August Agreement resulted in the second *446 type of binding preliminary agreement-"a binding preliminary commitment"-the Court looks to the following factors examined by Judge Leval in determining whether the parties evinced an intent to be bound: (1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) any partial performance; and (5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions. See Id. at 499-503. In seeking to determine whether such a preliminary binding commitment was established, "a court's task is, once again, to determine the intentions of the parties at the time of their entry into the understanding, as well as their manifestations to one another by which the understanding was reached." Id. at 499. Just as for the first type of binding agreement, the parties must manifest a mutual intent to be bound in order for the Court to find that a binding preliminary commitment has been made. See id., 670 F.Supp. at 498; Dunk, 84 F.3d at 82. In this analysis, as in the analysis above, courts have found the first factor, the language of the agreement, to be the most important. Tribune, 670 F.Supp. at 499. Again, in this case, since the alleged agreement was an oral agreement, the only evidence we have of its language is the language of the draft agreements. In Tribune, the Court found the language of the agreement at issue in that case, which reserved rights of approval and established conditions, such as the preparation and execution of documents satisfactory to both parties, could be part of a binding preliminary commitment; the Court found that such terms were "by no means incompatible with [the] intention to be bound" to such a commitment. Id. at 500 (holding that making the agreement contingent on board approval and upon the preparation, execution and delivery of documents, did not override and nullify the acknowledgment that a binding preliminary commitment had been made on stated terms, and therefore both parties were obligated to negotiate in good faith to resolve the open terms). The Court also stated that the reasoning of the courts in R.G. Group and Reprosystem, where the courts found that a term stating that the agreement would be effective "when executed" conclusively established that no binding force was intended prior to execution, was of "diminishing force ... where the inquiry is not whether the parties had concluded their deal, but only whether they had entered into a binding preliminary commitment which required further steps." Id. at 500. While the Court does find from the language of the draft agreements and the July Memorandum that the parties did not manifest a mutual intent to be bound by the terms of the August Agreement, as was alleged by the plaintiffs, the Court cannot conclusively determine, from the language of these documents, that the parties did not manifest an intent to be bound "to negotiate together in good faith in an effort to reach final agreement within the scope" of the terms laid out in the August Agreement. See id. at 498. Therefore this factor is neutral, weighing neither in favor of the plaintiffs nor the defendants.
Looking to the second factor enunciated in Tribune -the context of the negotiations-the one factor not considered in the analysis for the first type of binding agreement, the Court looks to where the parties alleged oral agreement fell within the course of the negotiations. The plaintiffs allege that the parties had at least two meetings and several conversations regarding the deal prior to their oral agreement on August 22, 2001. See Am. Comp. ¶¶ 30, 31, 35. Therefore, the Court cannot say that the negotiations were at such a preliminary stage that the parties conclusively could have evinced no intent to be *447 bound to a preliminary commitment. Cf. Cleveland Wrecking Co., 23 F.Supp.2d at 298 (finding no binding preliminary commitment between the parties, in part because agreement was made at their first formal negotiating session, and therefore the context of the negotiations suggested the preliminary nature of the agreement). Accordingly, drawing all reasonable inferences in favor of the plaintiffs, this factor weighs slightly in favor of the plaintiffs.
In most cases where the courts have found a binding preliminary commitment, the parties have purposely left open terms to be negotiated in good faith. See, e.g., Tribune, 670 F.Supp. at 499; P.A. Bergner & Co., 823 F.Supp. at 158. In this case, the plaintiffs have not alleged that the parties purposely left terms open to be negotiated in good faith, however, it is clear from the facts alleged both that the parties did not reach an agreement on all terms in the August Agreement and that the parties did engage in some negotiations about those open terms after they reached their alleged oral agreement. Am. Comp. ¶¶ 43, 44. While courts have found the existence of open terms to indicate the parties' intention not to be bound to the terms of a preliminary agreement, courts have found that factor to play a less significant role in the determination of whether the parties evinced an intent to be bound to a negotiate those open terms in good faith. See Tribune, 670 F.Supp. at 499 ("To consider the existence of open terms to be as fatal would be to rule, in effect, that binding preliminary commitments cannot be enforced. That is not the law.")
For the reasons stated in the analysis above, the partial performance factor weighs slightly in favor of the plaintiffs, and the final factor-whether the agreement is one that would have normally been committed to writing-weighs in favor of the defendants.[6] While the defendants have a strong argument that the parties evinced no intention to be bound, either to the terms of the agreement or to a duty to negotiate that agreement in good faith, drawing all reasonable inferences in favor of the plaintiffs, the Court must deny defendants' motion to dismiss plaintiffs' claim alleging a breach of contract, and allow the plaintiffs to submit evidence in support their claim that such a binding preliminary commitment resulted from the parties' alleged oral agreement on August 22, 2001.
C. Claim II: Breach of Implied Contract
The law recognizes two types of implied contracts, those which are implied by the facts and those which are implied by the law. A contract implied from the facts is found where the consent of the parties to the agreement may be inferred from the acts of the parties and all of the surrounding circumstances. Tjoa v. Julia Butterfield Mem'l Hosp., 205 A.D.2d 526, 612 N.Y.S.2d 676 (2d Dep't 1994). Furthermore, "a contract cannot be implied-in-fact where the facts are inconsistent with its existence ... or against the intention or understanding of the parties." Tjoa, 612 N.Y.S.2d at 677. An implied-in-fact contract arises in the absence of an express agreement, and is based on the conduct of the parties from which a fact-finder may infer the existence and terms of a contract. See AEB & Assocs. *448 Design Group, Inc. v. Tonka Corp., 853 F.Supp. 724, 731 (S.D.N.Y.1994). Since the Court cannot conclusively determine that the parties did not make a binding preliminary commitment in their alleged oral agreement, the Court cannot dismiss the plaintiffs' claim for breach of implied contract. Moreover, whether certain conduct gives rise to an implied contract is a question of fact, to be determined under the circumstances of the case. See id.; see also Radio Today, Inc. v. Westwood One, Inc., 684 F.Supp. 68, 71 (S.D.N.Y.1988). The relevant inquiry is whether the party to be charged "has conducted himself in such a manner that his assent may fairly be inferred." Miller v. Schloss, 218 N.Y. 400, 407, 113 N.E. 337 (1916); accord Tjoa, 612 N.Y.S.2d at 677. As such, it would not be appropriate to dismiss the plaintiffs' claim for breach of implied contract at this point.
D. Claim III: Promissory Estoppel
Under New York law, promissory estoppel has three elements: "`a clear and unambiguous promise; a reasonable and foreseeable reliance by the party to whom the promise is made; and injury sustained by the party asserting the estoppel by reason of his reliance.'" Esquire Radio & Elecs., Inc. v. Montgomery Ward & Co., 804 F.2d 787, 793 (2d Cir.1986) (quoting Restatement (Second) of Contracts § 90 (1981)). The plaintiffs have alleged that: 1) the defendants made a clear and unambiguous promise to allow Spencer Trask to participate in the overall deal structure, in which Spencer Trask would invest in the Series B financings and purchase a portion of the founders' shares; 2) the plaintiffs reasonably and foreseeably relied on those promises by investing $500,000 in the company's Series B financing; and 3) as a result of that reliance, Spencer Trask has been injured in three ways.[7]See Am. Comp. ¶¶ 84-86. While the defendants have pointed to evidence that indicates that the plaintiffs' $500,000 investment in the Series B financing did not represent reasonable reliance on the defendants' alleged promise, pointing to the portion of the Debt Agreement which provided that it was the "entire agreement among the parties hereto with respect to the subject matter hereof," Debt Agreement at ¶ 9(e), such evidence cannot conclusively establish at this stage the issue of whether or not the $500,000 constituted reasonable reliance. See supra pp. 443 - 444. Therefore, plaintiffs have adequately pled all three elements of promissory estoppel, and the defendants' motion to dismiss the plaintiffs' claim for promissory estoppel is denied.
E. Claim VIII: Unjust Enrichment
Under New York law, "a plaintiff seeking an equitable recovery based on unjust enrichment must first show that a benefit was conferred upon the defendant, and then show that as between the two parties, enrichment of the defendant was unjust." Reprosystem, 727 F.2d at 263 (2d Cir.1984) (citing Indyk v. Habib Bank Ltd., 694 F.2d 54, 57 (2d Cir.1982)); Dolmetta v. Uintah Nat'l Corp., 712 F.2d 15, 20 (2d Cir.1983) ("To recover on a theory *449 of unjust enrichment, a plaintiff must prove that the defendant was enriched, that such enrichment was at plaintiff's expense, and that the circumstances were such that in equity and good conscience the defendant should return the money or property to the plaintiff.") Plaintiffs have alleged that allowing the defendants to retain the benefit of the $500,000 investment and the value of the plaintiffs' reputation and good name as an investor, without honoring the balance of their alleged August agreement would be unjust. Am. Comp. ¶ 120. Since plaintiffs have adequately pled that a benefit was conferred upon the defendants and that the defendants' enrichment was unjust and at the plaintiffs' expense, the defendants' motion to dismiss the unjust enrichment claim is denied.
F. Claim IX: Breach of Duty of Good Faith and Fair Dealing
The covenant of good faith and fair dealing, implied in every contract under New York law, "includes `an implied undertaking on the part of each party that he will not intentionally and purposely do anything to prevent the other party from carrying out the agreement on his part.'" Carvel Corp. v. Diversified Mgmt. Group, Inc., 930 F.2d 228, 230 (2d Cir.1991) (quoting Grad v. Roberts, 14 N.Y.2d 70, 75, 248 N.Y.S.2d 633, 198 N.E.2d 26 (1964)). Since this Court is not willing to dismiss the plaintiffs' claim for breach of contract at this juncture, the Court also denies the defendants' motion to dismiss the plaintiffs' claim for breach of duty of good faith and fair dealing.
G. Statute of Frauds Considerations
The defendants argue that enforcement of the August Agreement is barred under the Statute of Frauds, § 5-701(a)(1) of New York's General Obligations Law. "Under New York law, parties are free to enter into a binding contract without memorializing their agreement in a fully executed document." Winston, 777 F.2d at 80. However, New York law requires certain agreements to be in writing. See N.Y. Gen. Oblig. § 5-701.[8] While the Court finds that the August Agreement is not one that could have been performed within a year and therefore would be subject to the writing requirement of the Statute of Frauds, the Court does not grant the defendants' motion to dismiss the breach of contract claim based on the Statute of Frauds, since the Court finds that, drawing all reasonable inferences in favor of the plaintiffs, plaintiffs could establish that the August Agreement should be deemed a "sale of securities" under Section 8-113 of the Uniform Commercial Code ("UCC"), and therefore exempted from the writing requirement of the Statute of Frauds even though it cannot be performed within a year.
Section 5-701(a)(1) has been read narrowly so as to bar oral agreements when there is no "possibility in fact and law of full performance within one year." Ohanian v. Avis Rent A Car Sys., Inc., 779 F.2d 101, 106 (2d Cir.1985) ("The one-year provision has been held not to preclude an oral contract unless there is `not ... the slightest possibility that it can be fully performed within one year.'") (citing 2 Corbin on Contracts § 444, at 535; Warner *450 v. Texas & Pac. Ry., 164 U.S. 418, 434, 17 S.Ct. 147, 41 L.Ed. 495 (1896) ("The question is not what the probable, or expected, or actual performance of the contract was; but whether the contract, according to the reasonable interpretation of its terms, required that it should not be performed within the year.")). RPost contends that since a key provision of the August Agreement was Spencer Trask's right to purchase shares from the founders over a set eighteen month period, the contract was incapable of being performed within a year, and therefore the Statute of Frauds bars Spencer Trask's breach of contract claim as a matter of law. See Def. Memo at 22. Spencer Trask argues that the August Agreement was capable of being performed within a year since Spencer Trask had the right, but not necessarily the obligation, to purchase each of the three rounds of the founders' shares; "thus, Spencer Trask could have elected to make only the first two purchases and forego the third, thereby completing the deal in less than a year." Pl. Opp. at 25.
However, just because Spencer Trask could have chosen not to exert their right to purchase shares in the third round, its choice would not have extinguished RPost's obligation to sell those shares. "The touchstone of an inquiry under Section 5-701(a)(1) is ... whether the contract by its terms is incapable of performance within one year, because it places indefinite liability on the defendant." Day v. Meyer, 2000 WL 1357499, *5 (S.D.N.Y. Sept. 19, 2000) (Court held that the alleged contract was capable of performance within one year because defendants' liability could have concluded within one year if performance was achieved within one year.). In the case at hand, RPost's liability under the August Agreement would not have ended upon Spencer Trask's election to forego a third round. Under the August Agreement, RPost still would have been under a duty to sell the founders' shares in the third round if Spencer Trask had wanted to purchase them, and therefore the alleged contract was not capable of being performed within a year. See Zupan v. Blumberg, 2 N.Y.2d 547, 161 N.Y.S.2d 428, 429, 141 N.E.2d 819 (1957); Martocci v. Greater New York Brewery, 301 N.Y. 57, 63, 92 N.E.2d 887 (1950) (holding that the contract fell within the Statute of Frauds since, under the terms of the contract, the contractual relationship between the parties would continue beyond a year, "even though the continuing liability to which defendant is subject is merely a contingent one. The endurance of defendant's liability is the deciding factor."). Since the August Agreement, as alleged by the plaintiffs, was not capable of being performed within a year, it would be subject to the Statute of Frauds.
Furthermore, the Court dismisses Spencer Trask's argument that the August Agreement would be exempt from the Statute of Frauds under the doctrine of partial performance. Section 5-701(a) does not expressly provide a part performance exception, and the New York Court of Appeals has firmly stated that there is no such exception. See Messner Vetere Berger McNamee Schmetterer Euro RSCG Inc. v. Aegis Group PLC, 93 N.Y.2d 229, 689 N.Y.S.2d 674, 677 n. 1, 711 N.E.2d 953 (1999) (stating that Court had "not ... adopted [the] proposition" that there is a "judicially-created part performance exception to [General Obligations Law] § 5-701"); Valentino v. Davis, 270 A.D.2d 635, 703 N.Y.S.2d 609, 611 (3d Dep't 2000) (holding that "the doctrine of part performance cannot save contracts governed by General Obligations Law § 5-701"); see also Belotz v. Jefferies & Co., Inc., 213 F.3d 625, 2000 WL 665564 (2d Cir.2000) (unpublished) (holding that the doctrine of part performance is "of no aid to the appellant" *451 since the New York Court of Appeals has stated that there is no such exception to Section 5-701). Moreover, even assuming arguendo that there is a part performance exception to Section 5-701, the plaintiffs' actions must be "unequivocally referable" to the alleged oral agreement as to warrant enforcing it. Anostario v. Vicinanzo, 59 N.Y.2d 662, 664, 463 N.Y.S.2d 409, 450 N.E.2d 215 (1983) (noting that, in reference to a contract subject to the Statute of Frauds under Gen. Oblig. § 5-703, the doctrine of part performance applies only where plaintiff's actions are" `unintelligible or at least extraordinary,' explainable only with reference to the oral agreement" (citation and internal quotation omitted)). In this case, even viewing the facts in the light most favorable to the plaintiffs, Spencer Trask's investment in the Series B round of financing and RPost's due diligence cannot be deemed "unequivocally referable" to the August Agreement, since it is explainable as a result of the November agreement. See Debt Agreement.[9]
However, Spencer Trask argues that even if the August Agreement falls within the Statute of Frauds, it would be exempted from the Statute under Section 8-113 of the UCC, adopted by New York in 1997. Section 8-113 provides, in pertinent part:
[A] contract or modification of a contract for the sale or purchase of a security is enforceable whether or not there is a writing signed or record authenticated by a party against whom enforcement is sought, even if the contract or modification is not capable of performance within one year of its making.
N.Y.U.C.C. § 8-113(a). This provision replaces former UCC § 8-319, which did subject a contract for the sale of securities to the Statute of Frauds. Spencer Trask argues that the August Agreement between Spencer Trask and RPost plainly called for the purchase of securities by Spencer Trask since Spencer Trask would have the right under that Agreement to purchase the founders' shares in three tranches. See Pl. Opp. at 25; Am. Comp. ¶ 33. RPost contends that the alleged agreement to sell a certain percentage of the founders' shares to Spencer Trask should not be deemed a "sale of security" within the meaning of § 8-113, since § 8-113 was not intended to encompass the type of complex agreement alleged in this case. See Def. Memo at 23. RPost argues that the Official Comment to N.Y.U.C.C. § 8-113 indicates that § 8-113 was intended only to cover "simple stock purchases and sales and allow for electronic transactions such as `day trading.'" Def. Mem. at 23. However, in light of the dearth of New York case law defining the parameters of § 8-113, the Court finds that it would be better equipped to address the issue of whether the August Agreement should be deemed "a sale or purchase of a security" under UCC § 8-113, and therefore exempted from the writing requirement of the Statute of Frauds, with the additional information available at the summary judgment stage. Moreover, since the plaintiffs are entitled to offer evidence that their breach of contract claim is not barred by the Statute of Frauds, they are also entitled to offer evidence that their equitable claims for implied *452 contract, promissory estoppel, unjust enrichment, and breach of covenant of good faith and fair dealing are not barred by the Statute of Frauds.
H. Fraud Claims
The plaintiff asserts four claims based on alleged fraud: (1) violations of Section 10(b) and Section 20 of the Securities Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78(b) and 78t(a)) and S.E.C. Rule 10b-5 promulgated thereunder; (2) common law fraud; (3) equitable estoppel based on alleged fraud; and (4) and breach of warranty. While each of these fraud claims have their own legal elements, each claim requires, that the plaintiffs allege and ultimately prove that the defendants made false representations, that the plaintiffs reasonably relied on those false representations, and that that reliance caused injury to the plaintiffs. In Re Time Warner Inc. Secs. Litig., 9 F.3d 259, 264 (2d Cir.1993) (§ 10(b) and Rule 10b-5); Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (1996) (common law fraud); Chadirjian v. Kanian, 123 A.D.2d 596, 506 N.Y.S.2d 880, 882 (2d Dep't 1986) (equitable estoppel); CBS Inc. v. Ziff-Davis Pub. Co., 75 N.Y.2d 496, 554 N.Y.S.2d 449, 453, 553 N.E.2d 997 (1990) (breach of warranty).[10] Defendants argue that plaintiffs have failed to state a claim for fraud since they cannot show reasonable reliance or actual injury. See Def. Mem. at 27. While the Court finds that the determination of reasonable reliance is largely an issue of fact, inappropriate for resolution at this early stage, the Court also finds that the plaintiffs have not adequately established the pleading requirement of loss causation, essential under the federal securities and common law fraud claims, and have therefore failed to make an adequate allegation of injury under those claims.
The plaintiffs have based their fraud-related claims on four categories of alleged misstatements and omissions made by the defendants: 1) statements about the RPost's relationship and the status of negotiations with the USPS; 2) statements about RPost's management; 3) statements about the number of options in reserve; and 4) statements about the defendants' intent to fulfill the terms of the August Agreement.[11] Even before addressing the inadequate allegations of injury, the Court can dispense with the fourth category upon which the plaintiffs' fraud claims are premised-the statements made by the defendants regarding their intent to perform a contract. While it is true that a fraud claim may be based on allegations that the defendant fraudulently induced the plaintiff to enter into a contract, the plaintiff may only bring such a claim if the misrepresentations alleged consist of more than *453 mere promissory statements about what is to be done in the future. First Bank of Americas v. Motor Car Funding, Inc., 257 A.D.2d 287, 690 N.Y.S.2d 17 (1st Dep't 1999) (observing that a fraud claim should be dismissed as redundant when the only fraud alleged is that the defendant was not sincere when it promised to perform under the contract). Furthermore, New York courts have held that, where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, "the fraud claim is redundant and the plaintiff's sole remedy is for breach of contract." Sudul v. Computer Outsourcing Servs., 868 F.Supp. 59, 62 (S.D.N.Y.1994); Briefstein v. P. J. Rotondo Const. Co., 8 A.D.2d 349, 187 N.Y.S.2d 866, 868 (1959) ("[T]o say that a contracting party intends when he enters an agreement not to be bound by it is not to state fraud in an actionable area, but to state a willingness to risk paying damages for breach of contract.") However, the Second Circuit has explained that a fraud claim, in the context of a simultaneous claim for failure to perform an alleged contract, may be brought in three circumstances: (1) where there is a legal duty separate from the duty to perform under the contract; (2) where there is a "fraudulent misrepresentation collateral or extraneous to the contract"; or (3) where the misrepresentation causes special damages that are "unrecoverable" as contract damages. Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir.1996). In this case, allegations regarding the defendants' intent not to perform the contract are not the sole basis for the plaintiffs' fraud claim; rather the plaintiffs have made other allegations regarding fraudulent misrepresentations extraneous to the contract. As such the plaintiffs' fraud claims based on the first three categories of alleged misrepresentations cannot be dismissed as redundant, however, their fraud claims based on the fourth category-the defendants' allegedly fraudulent statements regarding their intent to perform the contract-must be denied since the plaintiffs' sole remedy for that claim is under their breach of contract claim.[12]
I. Claims VII and V: Federal Securities and Common Law Fraud Claims
Turning the Court's attention to the remaining three categories of alleged misrepresentations and omissions, the Court finds that the plaintiffs have failed to make an adequate allegation of the injury and loss causation or proximate cause element required under both the federal securities and the common law fraud claims. To state a claim for fraud under § 10(b), Rule 10b-5 or New York common law, a plaintiff must allege a misrepresentation or a material omission of fact which was false and known to be false by defendant, that the plaintiff reasonably relied upon, and that as a proximate cause of that *454 reliance, the plaintiff suffered injury.[13]See In re Time Warner., 9 F.3d at 264 ("[T]o state a cause of action under Section 10(b) or Rule 10b-5 plaintiffs must allege and ultimately prove that defendants (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury."); Lama, 88 N.Y.2d at 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 (in order to state a common law fraud claim under New York law, the plaintiff must allege "a misrepresentation or a material omission of fact which was false and known to be false by defendant, made for the purpose of inducing the other party to rely upon it, justifiable reliance of the other party on the misrepresentation or material omission, and injury.")
1) Inadequate Allegation of Injury
"It is fundamental that in order to secure relief, either legal or equitable, for fraud, the person seeking redress must have been damaged, injured, or harmed as a result of the asserted fraud, that is, must have thereby been misled to his or her injury." 60A N.Y. Jur.2d Fraud and Deceit § 170. Moreover, in order to sustain an action for fraud, there must be some actual loss incurred as a direct result of the wrong by the party bringing the action, and in an action for damages, the plaintiff must make a showing of some concrete pecuniary loss. See Dornberger v. Metropolitan Life Insurance Co., 961 F.Supp. 506, 543 (S.D.N.Y.1997); 60A N.Y. Jur.2d Fraud and Deceit § 170. Defendants argue that the plaintiffs have failed to allege this element because plaintiffs have not alleged "that the value of [Spencer Trask's] actual $500,000 investment in RPost has been harmed in any way due to the alleged fraud, or that it has suffered any other out-of-pocket injury." Def. Mem. at 28. Plaintiffs argue that they have adequately alleged injury on two levels: 1) the value of their $500,000 investment has been diminished as a result of the defendants' alleged misrepresentations, and 2) they are less able to influence the defendants' business strategy with the 2% ownership interest received from their $500,000 investment, rather than the 20% ownership interest they would have had if the parties had fulfilled the August Agreement. See Pl. Opp. at 28. This latter injury is not a cognizable one for the fraud claim since this injury did not result from the defendants' alleged misrepresentations but rather from the defendants' failure to comply with the terms of the August Agreement. As such, the harm sustained by having only a 2% ownership investment would be recoverable under the breach of contract claim, not the fraud claim. See N.Y.Jur.2d Fraud and Deceit § 7 ("A cause of action for fraud, as opposed to breach of contract, will not lie where the only damages proximately caused by the alleged fraud are those recoverable under a claim for breach of contract.")
As for the plaintiffs' first alleged injury, the diminished value of their $500,000 investment in RPost, the plaintiffs have failed to allege any facts that could lead a trier of fact to find that they had suffered an injury as a result of the aforementioned three categories of alleged misrepresentations. See Packer v. Yampol, 630 F.Supp. 1237, 1241 (S.D.N.Y.1986) (holding that plaintiffs failed to satisfy their burden of pleading facts in support of each element of their 10b-5 claim, because *455 they did not adequately plead facts constituting injury). In order to properly allege injury, the plaintiffs must allege facts from which damages can be properly inferred. Black v. Chittenden, 60 N.Y.2d 665, 668 (1983); A.S. Rampell, Inc. v. Hyster Co., 3 N.Y.2d 369, 383, 165 N.Y.S.2d 475, 144 N.E.2d 371 (1957). At a minimum, the plaintiffs must make factual allegations describing the pecuniary or out-of-pocket loss sustained as a result of the defendants' alleged misrepresentations in order to maintain a claim for damages based upon fraud, and the plaintiffs in this case have failed to do so. Dornberger, 961 F.Supp. at 544 (finding the pleading requirement for pecuniary loss under a fraud claim to be similar to that under a RICO claim); Lama 88 N.Y.2d at 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370. In Dornberger, the Court found that the plaintiffs adequately pled pecuniary loss so as to state a claim for damages on the basis of fraud by alleging facts of the plaintiff's payment of premiums on certain items, based on the understanding that the taxes and the servicing payments for those items had been paid when they had not. 961 F.Supp. at 544. Therefore, the plaintiffs could identify the extent of the pecuniary loss they sustained as a result of the misrepresentations. In the case at bar, the plaintiffs have alleged no facts in the Amended Complaint regarding any decrease in value of their $500,000 investment,[14] but rather the plaintiffs merely argue, in their response to the defendants' motion to dismiss, that the value of their investment is less than they were led to believe. See Pl. Opp. at 28. The plaintiffs' conclusory allegation of a decrease in the value of their investment, without any factual allegations to support a finding that the value of the plaintiffs' investment has in fact declined or is worth less than what the plaintiffs paid for it, does not constitute an adequate allegation of injury. See Packer, 630 F.Supp. at 1240 (dismissing complaint because the complaint failed to allege, "except in the most conclusory terms, that plaintiffs have suffered an injury").
2) Failure to Allege Loss or Proximate Causation
Moreover, even if the plaintiff had alleged sufficient facts to establish that they had been injured by a decrease in the value of their investment, they have not adequately alleged any causal connection between the alleged misrepresentations and the resulting injury. As such the plaintiffs have failed to establish the loss or proximate causation element, required under both the common law and the federal securities law fraud claims identified in the Amended Complaint. See Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc., 165 F.Supp.2d. 615, 625 (S.D.N.Y.2001). Under both the common law and the § 10b claim, the plaintiffs must allege both "transaction causation, i.e. that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, i.e. that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 95 (2d Cir.2001) (citing Mfrs. Hanover Trust Co. v. Drysdale Secs. Corp., 801 F.2d 13, 20 (2d Cir.1986) ("The standard for liability in a civil action under *456 section 10(b) is causation not merely in inducing the plaintiff to enter into a transaction or series of transactions, but causation of the actual loss suffered.")); Citibank N.A. v. K-H Corp., 968 F.2d 1489, 1496-97 (2d Cir.1992) (affirming this Court's dismissal of a common law fraud claim because the plaintiff did not adequately allege that the damages suffered were proximately caused by the alleged misrepresentations of the defendants). Therefore, in order to sustain a claim for fraud under § 10(b) of the Exchange Act or the common law, "the plaintiff must demonstrate that the fraud caused the plaintiff to engage in the transaction and that it also caused the harm actually suffered." Suez Equity Investors, 250 F.3d at 97; Emergent, 165 F.Supp.2d at 625.
Defendants argue that the plaintiffs' fraud-based claims must be dismissed since the plaintiffs have failed to allege both the transaction and loss causation elements necessary to adequately allege the common law and § 10(b) fraud claim. The Court finds that the Amended Complaint does adequately plead the transaction causation element, by alleging that, but for the alleged misrepresentations, the plaintiffs would not have made the $500,000 investment in RPost. See Am. Comp. ¶¶ 33, 34, 94. Nevertheless, the Court agrees with the defendants that the Amended Complaint fails to establish the loss causation pleading requirement, and as such the plaintiffs have failed to state a claim for fraud under both § 10b of the Exchange Act and the common law.[15] In order to plead loss causation, the plaintiffs must establish that the misrepresentations were the cause of the actual loss suffered. See Suez, 250 F.3d at 96; Emergent, 165 F.Supp.2d at 625 (holding that with respect to claims regarding non-disclosure of information, the plaintiff had to establish a causal connection between the omission and the injury in order to plead loss causation). Whereas the plaintiff in Suez directly linked the misrepresentations concerning the principal's personal and financial background to a decline in the stock through his mismanagement of the company, in this case, the plaintiffs have merely alleged a decline in the value of their investment without giving the Court any indication of the extent of such a decline or the basis for their belief that the value of the investment has decreased (e.g. a decline in stock price), and without linking the defendants' alleged misrepresentations with the alleged decline in the value of their investment. See Suez, 250 F.3d at 96. In Suez, the Court found that the plaintiff had adequately pled the loss causation requirement because the plaintiff alleged that the defendants' misrepresentations regarding the principal's background induced a disparity between the transaction price and the true value of the investment in the securities at the time of the transaction, id. at 97-98, whereas the plaintiffs in this case have not alleged any such connection between the alleged misrepresentations and any injury suffered. Moreover, since the plaintiffs have failed to allege the nature of their recoverable damages, they were unable to establish a causal connection between certain misrepresentations and what damages there may be been.
3) Injury Must Be Limited to Out-of-Pocket Damages
The plaintiffs' only allegation of injury in the Amended Complaint is the statement that they have suffered damages *457 as a result of the alleged fraudulent misrepresentations in an amount not less than $500 million. See Am. Comp. ¶ 97. That number presumably reflects the plaintiffs' estimation of the amount they stood to gain if the parties had fulfilled the terms of the August Agreement, and not their out-of-pocket injury, which would be limited to their $500,000 investment. Those damages representing the amount that the plaintiffs stood to gain if the defendants' had completed the terms of the August Agreement would be recoverable under the breach of contract action but not under the fraud claim. Even if the plaintiffs had established the loss causation element required to adequately plead a claim for fraud, under New York law they would be confined to recovering the actual pecuniary loss sustained as a result of the defendants' fraudulent misrepresentations. See Lama, 88 N.Y.2d at 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370 ("`The true measure of damage is indemnity for the actual pecuniary loss sustained as a direct result of the wrong' or what is known as the `out-of-pocket' rule.") (quoting Reno v. Bull, 226 N.Y. 546, 553, 124 N.E. 144 (1919)); Sager v. Friedman, 270 N.Y. 472, 481, 1 N.E.2d 971 (1936) (under the out-of-pocket rule, damages are to be computed by determining the "difference between the value of the bargain which a plaintiff was induced by fraud to make and the amount or value of the consideration exacted as the price of the bargain"). Furthermore, under the out-of-pocket rule, there can be no recovery of profits "which would have been realized in the absence of fraud." Lama, 88 N.Y.2d at 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370. Therefore, to the extent that the $500 million figure represents the plaintiffs' estimation of the profits that they would have made but for the defendants' misrepresentations, those damages are not recoverable under New York law because plaintiffs are not entitled to recover lost profits on their fraud claims. See Three Crown Ltd. P'ship v. Salomon Bros., Inc., 906 F.Supp. 876, 891 (S.D.N.Y.1991); A.I.A. Holdings, S.A. v. Lehman Bros. Inc., 2002 WL 1334809, at *3 (S.D.N.Y. June 17, 2002). Under the out-of-pocket rule, damages are to be calculated to compensate the plaintiffs for money they actually lost because of the fraud, not to compensate them for what they might have gained. See Lama, 88 N.Y.2d at 421, 646 N.Y.S.2d 76, 668 N.E.2d 1370; Rappaport v. Buske, 2000 WL 1224828, *9 (S.D.N.Y. Aug. 29, 2000) (dismissing fraud claim because plaintiff adduced no evidence that she had suffered an out-of-pocket loss and the Court found no actionable fraud claim where plaintiff's allegation of damages from the fraud "does not reflect out-of-pocket pecuniary loss, but rather is the amount plaintiff stood to gain if the parties had gone forward with the series").
Lastly, plaintiffs assert that their allegation of injury in the Amended Complaint is sufficient to state a claim for fraud, and that under Rule 9(b) of the Federal Rules of Civil Procedure, no detailed pleading of fraud damages is required. See Pl. Opp. at 38. Plaintiffs rely on the Second Circuit opinion in Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir.2000), for this premise. However in that case, the Second Circuit's language regarding the pleading requirement for a fraud claim pertained solely to the scienter requirement and the facts that must be alleged in order to state the element of fraudulent intent, but did not at any point address the pleading requirement for the injury element. Id. at 305-315. Contrary to the plaintiffs' argument, Courts in this District and this Circuit do require more than merely conclusory allegations of injury to state a claim for fraud. These Courts have required that the plaintiffs allege both transaction and loss causation, *458 and that the plaintiffs include facts in their complaint from which loss causation can be inferred. See Emergent, 165 F.Supp.2d at 626-27 (granting the defendants' motion to dismiss the federal securities and common law fraud claims because the plaintiffs failed to include facts in the amended complaint from which loss causation could be inferred, even though the plaintiff did allege that the "investment quality" of the securities purchased had diminished as a result of the defendants' fraudulent misstatements, and that those statements were the proximate cause of the plaintiff's injury); Citibank, N.A. v. K-H Corp., 968 F.2d 1489, 1496-97 (2d Cir.1992) (affirming the judgment of this Court dismissing both the § 10(b) federal securities fraud claim and the common law fraud claim because the plaintiffs failed to allege adequately a causal connection between the alleged fraudulent omission and the subsequent decline in the value of the securities).
4) Materiality and Reasonable Reliance
Having found that the plaintiffs failed to make an adequate allegation of injury, it is unnecessary for the Court to address the question of whether the plaintiffs have adequately alleged the elements of reasonable reliance and materiality. However, since the Court is dismissing the plaintiffs' federal securities and common law fraud claims with leave to replead, it is prudent for the Court to address these issues. Both the issues of materiality and reasonable reliance raise issues of fact that often make them unsuitable for determination on a motion to dismiss. See Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir.1999) (Oakes, J.) (holding that the determination of materiality is "a mixed question of law and fact that generally should be presented to a jury" (citing TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 439, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976))); ABF Capital Mgmt. v. Askin Capital Mgmt., L.P., 957 F.Supp. 1308, 1324 (S.D.N.Y.1997) ("Courts applying New York law generally have found that the question of a plaintiffs' reasonable reliance raises issues of fact that should not be resolved on a motion to dismiss."). While the Court may doubt the materiality of several of the misstatements and omissions alleged in the Amended Complaint, giving all reasonable inferences to the plaintiffs, the Court cannot determine at this point that the defendants' alleged misstatements and omissions are "so obviously unimportant to the reasonable investor that reasonable minds could not differ on the question of their importance." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir.1985) (Kearse, J.). Therefore, the Amended Complaint would not be dismissed on the ground that the alleged misstatements and omissions are not material.
Turning our attention to the issue of reasonable reliance, the Court finds that the Amended Complaint adequately alleges that the plaintiffs reasonably relied on the alleged misrepresentations about RPost's management, and the alleged misrepresentations made about the number of options in reserve. However, with respect to the statements about RPost's relationship with and the ongoing negotiations with the USPS in the July Memorandum, the Court is persuaded by the defendants' argument that reasonable reliance on any such statements is precluded as a matter of law by the inclusion of a disclaimer in the July Memorandum that "bespeaks caution."[16] The "bespeaks caution" doctrine *459 allows the Court to rule that defendants' forward-looking representations contain enough "cautionary language or risk disclosures" to protect against claims of securities fraud. In re Prudential Sec. Inc. Ltd. P'ships Litig., 930 F.Supp. 68, 71-72 (S.D.N.Y.1996). Courts in this District have applied the "bespeaks caution" doctrine at the pleading stage to dismiss securities fraud claims when the documents at issue have contained "extensive and specific warnings about the riskiness of investments." Id. However, courts have refused to apply the "bespeaks caution" doctrine at the pleading stage "where the defendants are alleged to have information that makes even the cautionary statements fraudulent." Id. (citing In re Marion Merrell Dow Inc. Sec. Litig., 1993 WL 393810, *8 (W.D.Mo. Oct. 4, 1993)). There are two limitations on the application of the "bespeaks caution" doctrine that the plaintiffs argue are applicable in this case, and therefore negate any effect the cautionary language in the disclaimer would have on the plaintiffs' reasonable reliance. See Pl. Opp. at 33-34. In order for the "bespeaks caution" doctrine to apply, 1) the cautionary language must "precisely address the substance of the specific statements or omissions being challenged," and 2) the cautionary language cannot protect material misrepresentations or omissions when defendants knew they were false when made. In re Prudential, 930 F.Supp. at 72. The Court disagrees with the plaintiffs' argument that both limitations apply in this case. The Court finds that the cautionary language in the disclaimer to the July Memorandum does precisely address the alleged misstatements and omissions pertaining to the status of RPost's negotiations with the USPS.[17]
Furthermore, the plaintiffs argue that their allegations that the defendants "made statements and omissions that were materially false and misleading," Am. Comp. ¶¶ 91, 99, are sufficient to invoke the second limitation of the "bespeaks caution" doctrine, preventing the application of that doctrine when the defendants are alleged to have information which makes the substance of the cautionary statements fraudulent. Pl. Opp. at 34; In re Marion Merrell Dow, 1993 WL 393810, at *8. However, this case can be distinguished from the two cases cited by the plaintiffs where the Court declined to apply the "bespeaks caution" doctrine as a result of the plaintiffs' allegations of the knowing falsity of the defendants' cautionary statements. In each of the cases cited by Spencer Trask, the plaintiffs made factual allegations regarding *460 the defendants' knowledge of information which would make the cautionary statements fraudulent, whereas in this case, the Amended Complaint made no such factual allegations. See In re Prudential, 930 F.Supp. at 71-72 (refusing to apply the "bespeaks caution" doctrine to prospectuses which the defendants alleged "disclosed all relevant risks" where plaintiffs made factual allegations regarding the defendants' knowledge that the value of their aircraft would decline radically); Kane v. Wichita Oil Income Fund, 1991 WL 233266, *2 (S.D.N.Y. Oct. 29, 1991) (Leisure, J.). In Kane, this Court refused to dismiss a fraud claim based on representations and projections of future profit where none was possible on the grounds that the defendants had included a "Risk Factors" section in their prospectus warning investors that investment in the defendants' company might result in a loss. 1991 WL 233266, *2 n. 1. However, the plaintiffs in Kane made several factual allegations regarding the defendants' knowledge that they were stating production levels for wells that were unrealistic in light of the data that the defendants had in their possession, that there was no possibility that the defendants would get the amount of money needed to keep the oil wells running, and that the defendants' company was "doomed to economic failure." Id. at *2. While it is clear that "warnings of possible detriment are insufficient if they are simply a smoke screen to cover a company's internal reasonably informed certainty of detriment," the Amended Complaint made no factual allegations regarding RPost's knowledge of any barricades or existing concerns in their negotiations with the USPS which would make the cautionary language fraudulent. In re Prudential, 930 F.Supp. at 74.[18]
Furthermore, the Court finds that the plaintiffs have failed to make an adequate allegation of reasonable reliance with respect to the oral or written representations made by defendants outside of the representations made in the July Memorandum, the Debt Agreement, or other documents provided by the defendants in response to the plaintiffs' request for information, as a result of the plaintiffs' acknowledgement in the Debt Agreement, signed when they made the $500,000 investment in RPost, that they did not rely on "any representations or other information (whether oral or written) other than as set forth" in the aforementioned documents. Debt Agreement at ¶ 8(b). The plaintiffs argue that the broad language of the disclaimer in the Debt Agreement lacks the requisite specificity to rule out the plaintiffs' reasonable reliance as a matter of law, however the Court finds that the language in the disclaimer is sufficiently specific to preclude reliance on any oral or written statements outside of those identified in the disclaimer. See Pl. Opp. at 35. Courts have found general merger clauses or disclaimers stating that the document being signed is the "entire agreement among the parties" and that it "supercedes all previous understandings among [the parties]" not to be sufficiently specific to disclaim reliance on certain prior *461 representations. Int'l Motor Sports Group, Inc. v. Gordon, No. 98 Civ. 5611, 1999 WL 619633, * 7 (S.D.N.Y. Aug. 16, 1999); O'Hearn v. Bodyonics Ltd., 22 F.Supp.2d 7, 13 (E.D.N.Y.1998) (holding that a general merger clause stating that the signatories acknowledge that the document supercedes all prior agreements and constitutes the "sole embodiment" of the parties' obligations does not bar an action for fraud). However, the disclaimer at issue is distinguishable from those in the aforementioned cases since it states that the defendants make no representations other than those made in the identified documents, and as such is sufficiently specific to bar the plaintiffs' claim of reasonable reliance on representations made outside of those documents. See Harsco Corp. v. Segui, 91 F.3d 337, 345-47 (2d Cir.1996) (fraud claim may be precluded when the contract states that the defendant makes no representations other than those contained in another clause of the contract); O'Hearn, 22 F.Supp.2d at 13 ("A specific disclaimer typically consists of a clause stipulating that the parties are not `relying' upon specified, extra-contractual representations." (citations omitted)).
J. Claim VI: Equitable Estoppel
In order to establish a claim for equitable estoppel, the plaintiff must allege reasonable reliance upon the words or actions of the defendants and, that as a result of such reliance, the plaintiffs prejudicially changed their position. See Chadirjian, 506 N.Y.S.2d at 882; Nassau Trust Co. v. Montrose Concrete Prods. Corp., 56 N.Y.2d 175, 451 N.Y.S.2d 663, 436 N.E.2d 1265 (1982). The plaintiffs have alleged that they reasonably relied on the statements of the defendants' indicating their intent to complete the terms of the August Agreement, and that their reliance on the defendants' representations caused a prejudicial change in their position-namely, "instead of standing to benefit as an investor with approximately 20% interest in RPost, Spencer Trask's interests stand to be diluted to less than 2% of RPost's shares upon completion of the Series C financing." Am. Comp. ¶ 109. Essentially, the plaintiffs allege that as a result of the defendants' failure to fulfill the terms of the August Agreement, the plaintiffs' were damaged in an amount not less than $500 million since they only received the 2% ownership interest from their $500,000 investment, rather than the 20% ownership interest that they would have had if the parties had completed the terms of the August Agreement. See Am. Comp. ¶¶ 109, 110. The plaintiffs'"prejudicial change" in their position was brought about by the defendants' failure to fulfill the terms of the alleged contract. As discussed supra, where the sole basis for the plaintiffs' fraud-based claim is the defendants' intent not to perform the contract, the proper relief is under a claim for breach of contract, not equitable estoppel. See Briefstein v. P.J. Rotondo Constr. Co., 8 A.D.2d 349, 187 N.Y.S.2d 866, 868 (1959) ("[T]o say that a contracting party intends when he enters an agreement not to be bound by it is not to state fraud in an actionable area, but to state a willingness to risk paying damages for breach of contract."). Therefore the defendants' motion to dismiss the plaintiffs' claim for equitable estoppel is granted.
K. Claim VII: Breach of Warranty
The plaintiffs claim that the defendants breached the warranty made in the Debt Agreement, which the plaintiffs signed when they made the $500,000 investment in RPost. In order to state a claim for breach of warranty, the plaintiffs must adequately allege that the defendants made such a warranty, that the plaintiffs relied on that warranty, and that the plaintiffs' *462 reliance caused damages. See Indep. Order of Foresters v. Donald, Lufkin & Jenrette, 157 F.3d 933, 938 (2d Cir.1998) (stating that "an express warranty arises as to securities being purchased when the seller directly affirms the quality or condition of the investment, the affirmation tends to induce the buyer's purchase, and the buyer purchases relying upon it") (citing Shippen v. Bowen, 122 U.S. 575, 581, 7 S.Ct. 1283, 30 L.Ed. 1172 (1887)). The plaintiffs claim that the defendants made such a warranty when the defendants represented that, "Except as updated by this Agreement [the Debt Agreement] the information contained in the Confidential Memorandum [the July Memorandum] is correct in all material respects and does not contain any untrue statement of a material fact or omit to state a material fact necessary to make statements set forth therein not misleading." Debt Agreement at 5. The plaintiffs allege that the July Memorandum did contain untrue statements of material fact and was not correct in all material respects. Am. Comp. ¶ 113. As discussed supra, the materiality of the defendants' misrepresentations is not suitable for determination on a motion to dismiss since the determination of materiality is "a mixed question of law and fact that generally should be presented to a jury." Press, 166 F.3d at 538; supra p. 458. Therefore, in determining whether the plaintiffs state a claim for breach of warranty, the Court must determine whether they adequately alleged that they reasonable relied upon this warranty, and that their reliance caused damages. As discussed supra, the plaintiffs need to make a different type of showing for reasonable reliance in a breach of warranty claim-essentially just a showing that the warranty was a bargained-for term of the agreement between the parties. See supra n. 10; Metromedia Co. v. Fugazy, 983 F.2d 350, 360 (2d Cir.1992) (Kearse, J.) (citing a New York Court of Appeals decision holding that a breach of warranty claim is "grounded in contract, and ... a buyer need not show that he `believed that the assurances of fact made in the warranty would be fulfilled. The right to indemnification depends only on establishing that the warranty was breached.'" (quoting CBS, 75 N.Y.2d at 503-04, 554 N.Y.S.2d 449, 553 N.E.2d 997 (1990))). Therefore since the warranty was included in the Debt Agreement signed by the plaintiffs on November 1, 2001, the plaintiffs have adequately alleged that they reasonably relied upon that warranty. Furthermore the Court finds that the plaintiffs' conclusory allegation of injury, which was insufficient to state a claim for federal securities or common law fraud because the plaintiffs failed to allege loss causation, is sufficient to withstand a motion to dismiss the breach of warranty claim since there is no requirement that the plaintiffs make this showing of loss causation.[19]

CONCLUSION
For the foregoing reasons, defendants' motion to dismiss all claims made in plaintiffs' Amended Complaint under Rule 12(b)(6) is granted as to claims IV (§ 10(b) *463 and § 20 of the Exchange Act and SEC Rule 10b-5); V (common law fraud); and VI (equitable estoppel), with leave to replead. Defendants' motion to dismiss is denied as to claims I (breach of contract); claim II (breach of implied contract); claim III (promissory estoppel); claim VII (breach of warranty); claim VIII (unjust enrichment); and claim IX (breach of duty of good faith and fair dealing). Furthermore, the stay of discovery pending disposition of the motion to dismiss, see Spencer Trask Software and Info. Servs., LLC v. RPost Intern. Ltd., 206 F.R.D. 367 (S.D.N.Y.2002), is hereby lifted.[20]
SO ORDERED.
NOTES
[1] Pro Hac Vice admission granted by this Court to Mr. Winston and Mr. Friedman on August 9, 2002.
[2] The defendants attached to their motion papers several documents extrinsic to the Amended Complaint. The Court declines to convert the motion to one for summary judgment and excludes from consideration all of the extrinsic documents and affidavits attached to the Defendants' Motion for Summary Judgment save three, which the Court finds have been "incorporated by reference" into the Amended Complaint. See Cortec, 949 F.2d at 47-48; Fed.R.Civ.P. 10(c). Therefore the Court will consider: (1) the July Memorandum, attached as Ex. A to the Affidavit of Zafar Kahn in Support of Motion to Dismiss First Amended Complaint ("Kahn Aff."), which the plaintiffs have relied heavily on in making their claims, see Am.Comp. ¶¶ 21-28, 91(a)-(e), (g)-(j); (2) the four draft letter agreements ("draft agreements"), attached as Ex. B to Kimberlin Aff., whose terms allegedly embody the August Agreement and were allegedly agreed to in telephone conversations between the parties, see Am. Comp. ¶¶ 41-42; and (3) the Debt Agreement, executed November 1, 2001, attached as Ex. L to Kimberlin Aff., which is the only investment agreement that Spencer Trask signed with RPost and from which plaintiffs quote significant portions in the Amended Complaint, see Am. Comp. ¶¶ 50, 91(q), 92; see also Advanced Marine Techs., Inc. v. Burnham Sec., Inc., 16 F.Supp.2d 375, 378 (S.D.N.Y.1998) (Court held that the plaintiff had incorporated a letter by reference into the Complaint since a paragraph of the complaint referred to that letter and quoted a significant portion of the letter). Furthermore, despite the fact that these documents were not attached to the Amended Complaint, the Court will consider them because the plaintiffs have actual notice of these agreements and rely upon them in the Amended Complaint. See Cortec, 949 F.2d at 48 (Court considered documents not attached to the Complaint where the plaintiffs either had those documents in their possession or had knowledge of them, and relied on those documents in framing their complaint); Kreiss v. McCown DeLeeuw & Co., 37 F.Supp.2d 294, 298 n. 3 (S.D.N.Y.1999) (Court considered documents not attached to the Amended Complaint, but which were integral to the plaintiff's claims, and which the plaintiff had notice of and relied upon).
[3] For the purposes of the present motion, the parties do not dispute that New York law governs the claims at issue in this case.
[4] The plaintiffs do not allege in the Amended Complaint that the defendants intended to be bound or that the defendants communicated an intent to be bound by the August Agreement, despite plaintiffs' contention to the contrary in their Opposition to Defendants' Motion to Dismiss and their citation to an inapposite paragraph of the Amended Complaint. Pl. Opp. at 15. However, plaintiffs' allegation that the parties reached an agreement on terms must be seen by the Court, in the context of a motion to dismiss, as evidence in support of defendants' intention to be bound.
[5] Plaintiffs claim that they alleged that the parties agreed to all material terms of the August Agreement, but they cite to an inapposite paragraph in the Amended Complaint to support this claim. See Pl. Opp. at 17. In fact plaintiffs' Opposition does not stand up to scrutiny, as it is replete with citations not supported by the Amended Complaint's actual allegations. E.g., Pl. Opp. at 2, 6, 13, 15-17.
[6] While it is most likely that an agreement to the terms stated in the alleged oral agreement would normally be in writing, a preliminary commitment to negotiate in good faith may be less likely to be expected to be in writing. However, the Amended Complaint did not allege that the August Agreement was an agreement to negotiate in good faith, but rather simply an agreement to the terms stated.
[7] The three ways in which the plaintiffs allege they have been injured are: 1) plaintiffs have invested $500,000 in a company which is attempting to dilute their ownership to an insignificant percentage; 2) plaintiffs are being deprived of the opportunity to protect their investment in the company by warding off the dilution that will occur in the Series C and D financing rounds; and 3) defendants have been able to promote additional financings by announcing to potential investors that Spencer Trask is investing in the defendants' company, while defendants are preventing Spencer Trask from completing the terms of the alleged August Agreement. Am. Comp. ¶ 86.
[8] N.Y. GOL § 5-701 provides in relevant part: "Every agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking ... [b]y its terms is not to be performed within one year from the making thereof or the performance of which is not to be completed before the end of a lifetime."
[9] Furthermore, the Court agrees with the defendants that the defendants' admission to an "agreement on terms" with Spencer Trask in August 2001 does not take the August Agreement outside of the Statute of Frauds, since the defendants did not admit to have reached a binding agreement, and unlike the situation in the case cited by the plaintiffs, In re Dissolution of C & M Plastics Inc., 194 A.D.2d 1020, 599 N.Y.S.2d 880, 882 (3d Dep't 1993), the defendants did not make any admission regarding the precise terms of the alleged agreement in any of their submissions to this Court.
[10] Plaintiffs assert that breach of warranty claims of not require a showing of reliance, see Pl. Opp. at 29. However, such claims do require a showing of reliance, it is merely a different type of showing. Courts evaluate the existence of reliance in a breach of warranty claim by looking at the terms of the contract. See CBS, 75 N.Y.2d at 506 n. 5, 553 N.E.2d 997 ("We do not hold that no reliance is required, but that the required reliance is established if, as here, the express warranties are bargained-for terms of the seller."); Ainger v. Michigan Gen. Corp., 476 F.Supp. 1209, 1225 (S.D.N.Y.1979) ("The question of whether the promisee `relied' on the warranty, then, is whether he believed he was purchasing the promise" as a part of the contract.)
[11] While the Amended Complaint does include allegations of misstatements made by the defendants after November 1, 2001, when the plaintiffs signed the Debt Agreement investing $500,000 in RPost, the plaintiffs concede that these statements could not be the subject of a fraud claim since the plaintiffs could not have relied upon them in making the investment in RPost. See Pl. Opp. at 30, n. 18.
[12] The Court finds plaintiffs' argument that they can maintain their fraud claim based on the defendants' alleged intention not to perform under the contract unpersuasive, and the authority cited for this premise inapposite. See Pl. Op. at 37. In Philips Credit Corp. v. Regent Health Group Inc., 953 F.Supp. 482, 520 (S.D.N.Y.1997), the Court did not address the issue of the redundancy of a fraud and a breach of contract claim based on the same set of facts, and furthermore, the Court held that "`[f]raudulent intent not to perform a promise cannot be inferred merely from the fact of nonperformance,'" and that additional proof is required for such a showing. Id. at 520 (citing Brown v. Lockwood, 76 A.D.2d 721, 432 N.Y.S.2d 186, 195 (2d Dep't 1980)). The Amended Complaint in this case makes no such showing.
[13] The plaintiffs also bring the claim under Section 20 of the Exchange Act, which imposes liability on controlling persons for violations of any section of the Act, including § 10(b)5. 15 U.S.C. § 78j(b).
[14] The Amended Complaint contains no allegations that the value of the plaintiffs' actual $500,000 investment has been harmed as a result of the alleged fraudulent misrepresentations; rather, the plaintiffs seek to be able to perform the terms of the August Agreement and invest even more money in RPost on the same terms agreed upon before the plaintiffs learned of the alleged fraudulent misrepresentations.
[15] To the extent that plaintiffs have failed to state a viable § 10(b) violation, the § 20 claim shall be dismissed as well.
[16] Under a section in the July Memorandum entitled "Risk Assessment", RPost includes a disclaimer which states in bold print, "We may be unable to finalize an agreement with the USPS on terms satisfactory or favorable to us." July Memorandum at 32. The July Memorandum continues to state, "We are currently in the final stages of negotiating an agreement with United States Postal Service that provides for a USPS branded, registered e-mail return receipt product powered by RPost. Such an agreement is critical to the marketing of our product and its credibility in the marketplace. No assurances can be given than an agreement will be reached with the USPS that is on terms that are satisfactory to us. Failure to reach such an agreement could adversely affect the business, financial condition and results of operations." Id. at 32-33.
[17] See supra n. 16. Furthermore, notwithstanding the Court's predisposition to make all reasonable inferences in favor of the plaintiffs at this stage, the Court finds the plaintiffs' argument that the disclaimer did not warn about the possibility of RPost not entering into an agreement with the USPS on the time frames represented, or at all, but merely conveyed the possibility that a contract may not be favorable to RPost, to be disingenuous at best. See Pl. Opp. at 34. Spencer Trask is, by its own admission, a experienced venture capital investor, see Am. Comp. ¶ 19, and is presumed to comprehend the implications of a disclaimer that warns of the possibility and the effect of the "failure to reach such an agreement." See July Memorandum at 33.
[18] While the Court agrees with the plaintiffs that the "bespeaks caution" doctrine does not bar a showing of the plaintiffs' reliance on statements of present fact regarding RPost's relationship with the USPS, including statements that RPost had a "partnership" with USPS, that negotiations were in their "final stages," and that the USPS was "moving forward aggressively with RPost," see Am. Comp. ¶ 25, the plaintiffs are still hampered in stating a claim that they reasonably relied on those statements of present fact, in light of the express warning in the disclaimer that RPost may be "unable to finalize an agreement with the USPS." July Memorandum at 32-33; see Def. Reply at 9.
[19] However, the Court notes that the damages for a breach of warranty claim are measured by the "benefit of the bargain" standard. See Clearview Concrete Products Corp. v. S. Charles Gherardi, Inc., 88 A.D.2d 461, 453 N.Y.S.2d 750, 756 (1982) (holding that under New York law, breach of warranty damages are usually measured by the "benefit of the bargain" rule, i.e. the difference between the actual value of the investment and the value which it would have had absent the breach). "The `benefit of the bargain' standard is intended to place the injured party in as good a position as would have been achieved had there been full performance of the contract, but the damages must be measurable with a reasonable degree of certainty and must be adequately proven." Id. at 756.
[20] In response to the defendants' request that the Court limit discovery to the claims that have survived the motion to dismiss, see Def. Reply at 10, n. 12, discovery is, obviously, so limited.